L. Donald THORSON and Sigrid I. Thorson, Plaintiffs and Respondents,

v.

CITY OF MINOT, a municipal corporation, Defendant and Appellant,

Morris Anderson and Betty Anderson, Wayne K. Larson and Marian Larson, Ivan Goheen and Lillian Goheen, Edwin H. Olson and Bertha Olson, Molla Romine, North Hill Development, Inc., a corporation, State of North Dakota, and Minot Public School District No. I of Ward County, North Dakota, Defendants.

Leslie RALSTON and Laura Ralston, Plaintiffs and Respondents,

v.

CITY OF MINOT, a municipal corporation, Defendant and Appellant,

Morris Anderson and Betty Anderson, Wayne K. Larson and Marian Larson, Ivan Goheen and Lillian Goheen, Edwin H. Olson and Bertha Olson, Molla Romine, North Hill Development, Inc., a corporation, State of North Dakota, and Minot Public School District No. I of Ward County, North Dakota, Defendants.

Charles W. LARCOMBE and Agnes M. Larcombe, Plaintiffs and Respondents,

v.

CITY OF MINOT, a municipal corporation, Defendant and Appellant,

Morris Anderson and Betty Anderson, Wayne K. Larson and Marian Larson, Ivan Goheen and Lillian Goheen, Edwin H. Olson and Bertha Olson, Molla Romine, North Hill Development, Inc., a corporation, State of North Dakota, and Minot Public School District No. I of Ward County, North Dakota, Defendants.

Harold KULAAS, Plaintiff and Respondent,

v.

CITY OF MINOT, a municipal corporation, Defendant and Appellant,

Morris Anderson and Betty Anderson, Wayne K. Larson and Marian Larson, Ivan Goheen and Lillian Goheen, Edwin H. Olson and Bertha Olson, Molla Romine, North Hill Development, Inc., a corporation, State of North Dakota, and Minot Public School District No. I of Ward County, North Dakota, Defendants.

Arvel N. GRAVING and Dorothy I. Graving, Plaintiffs and Respondents,

v.

CITY OF MINOT, a municipal corporation, Defendant and Appellant,

Morris Anderson and Betty Anderson, Wayne K. Larson and Marian Larson, Ivan Goheen and Lillian Goheen, Edwin H. Olson and Bertha Olson, Molla Romine, North Hill Development, Inc., a corporation, State of North Dakota, and Minot Public School District No. I of Ward County, North Dakota, Defendants.

Eilert MELBY and Alma Melby, Plaintiffs and Respondents,

v.

CITY OF MINOT, a municipal corporation, Defendant and Appellant,

Morris Anderson and Betty Anderson, Wayne K. Larson and Marian Larson, Ivan Goheen and Lillian Goheen, Edwin H. Olson and Bertha Olson, Molla Romine, North Hill Development, Inc., a corporation, State of North Dakota, and Minot Public School District No. I of Ward County, North Dakota, Defendants.

M. O. LEE and Irene Lee, Plaintiffs and Respondents,

v.

CITY OF MINOT, a municipal corporation, Defendant and Appellant,

Morris Anderson and Betty Anderson, Wayne K. Larson and Marian Larson, Ivan Goheen and Lillian Goheen, Edwin H. Olson and Bertha Olson, Molla Romine, North Hill Development, Inc., a corporation, State of North Dakota, and Minot Public School District No. I of Ward County, North Dakota, Defendants.

John D. SCHEFFER and Serena M. Scheffer, Plaintiffs and Respondents,

v.

CITY OF MINOT, a municipal corporation, Defendant and Appellant,

Morris Anderson and Betty Anderson, Wayne K. Larson and Marian Larson, Ivan Goheen and Lillian Goheen, Edwin H. Olson and Bertha Olson, Molla Romine, North Hill Development, Inc., a corporation, State of North Dakota, and Minot Public School District No. I of Ward County, North Dakota, Defendants.

Archie LEE and Marian Lee, Plaintiffs and Respondents,

v.

CITY OF MINOT, a municipal corporation, Defendant and Appellant,

Morris Anderson and Betty Anderson, Wayne K. Larson and Marian Larson, Ivan Goheen and Lillian Goheen, Edwin H. Olson and Bertha Olson, Molla Romine, North Hill Development, Inc., a corporation, State of North Dakota, and Minot Public School District No. I of Ward County, North Dakota, Defendants.

Eldon C. WHITE and Mary White, Plaintiffs and Respondents,

v.

CITY OF MINOT, a municipal corporation, Defendant and Appellant,

Morris Anderson and Betty Anderson, Wayne K. Larson and Marian Larson, Ivan Goheen and Lillian Goheen, Edwin H. Olson and Bertha Olson, Molla Romine, North Hill Development, Inc., a corporation, State of North Dakota, and Minot Public School District No. I of Ward County, North Dakota, Defendants.

Leo FECHO and Charlotte Fecho, Plaintiffs and Respondents,

v.

CITY OF MINOT, a municipal corporation, Defendant and Appellant,

Morris Anderson and Betty Anderson, Wayne K. Larson and Marian Larson, Ivan Goheen

and Lillian Goheen, Edwin H. Olson and Bertha Olson, Molla Romine, North Hill Development, Inc., a corporation, State of North Dakota, and Minot Public School District No. I of Ward County, North Dakota, Defendants.

Nos. 8423–8433.

Supreme Court of North Dakota.

Oct. 26, 1967.

Bosard, McCutcheon & Coyne, Minot, for defendant and appellant.

McGee, Van Sickle, Hankla & Backes, Minot, for plaintiffs and respondents.

ERICKSTAD, Judge.

The City of Minot appeals from eleven judgments against it, arising out of actions brought by the plaintiffs in eleven separate complaints and consolidated for purposes of trial.

Through two covenants not to sue, ten of the defendants were released from liability, and, as a result, the trial court dismissed the actions against them. Following the entry of the eleven judgments, the City moved to credit the judgments with the amount of the consideration received for the covenants not to sue. The trial court denied these motions, and it is from the orders denying these motions that the City also appeals.

■ Trial de novo is demanded. On a trial de novo this court must decide the facts anew. In trying the facts anew, the findings of the trial court are entitled to appreciable weight. This is especially so when the trial court has had the opportunity of seeing and hearing the witnesses and noting their demeanor. Gress v. Gress, 148 N.W.2d 166 (N.D.1967); Parceluk v. Knudtson, 139 N.W.2d 864 (N.D.1966).

■ There is even more reason to give the findings of the trial court credence when the issue involves damages caused by changes in the topography of the land, when the court has personally viewed the topography, making possible a clearer perspective than is attainable from a mere review of the record on appeal. In this case the transcript of the trial court proceedings discloses that the trial court in person viewed the topography of the land.

It should be noted that this court on review has been at a considerable disadvantage in attempting to understand the testimony of the witnesses, because much of it has related to locations, directions, and grades which have been described in the transcript by such wording as "([the witness] indicating)," making much of the testimony unintelligible to this court.

Thus, in light of the general rule to be applied in a case tried de novo and in light of the peculiarities of this case, we have reviewed the entire record and conclude that the facts support the trial court's finding that the City maintained a nuisance in operating its sanitary landfill in the ravine north of the Minot State College property within the city of Minot.

The landfill operation was commenced in 1958 in a ravine which sloped upward from south to north and extended from just north of the campus of Minot State College at 11th Avenue, N.W., to approximately 20th Avenue, N.W. This ravine had formed part of a natural drainage area which ran from the vicinity of 20th Avenue, N.W., through the ravine, south through the college campus to the Spring Lake area, passing to the east of the plaintiffs' property.

Prior to the beginning of the landfill the college had constructed a football field and an adjacent parking lot which extended east and west across the south end of the ravine and was raised approximately thirty feet above the original elevation of the terrain.

Ryan High School had also constructed a football field northeast of the college football field and parking lot. This football field overlapped the east end of the parking lot.

These two filled sites created a dam across the south end of the ravine; and to allow water to drain from behind this dam, the college had installed two 24-inch culverts under the parking lot portion of the dam. Only one of these culverts, however, projected from the north face of the dam, so water from the ravine flowed only through the one culvert.

Just north of and abutting this dam the City filled dirt the length of the dam, 15 feet wide and 4 feet higher than the dam created by the football fields and the parking lot. It also continued the metal culvert which ran under the college fill by connecting 24-inch concrete drainpipes to it and extending them northward along the floor of the ravine. About fifteen to twenty feet north of the college fill, a 48-inch manhole was installed, rising vertically from the newly placed drainpipe. This manhole was to be used to give access to the drainpipe for cleaning and maintenance. As the level of fill in this area was raised, the manhole was extended upward, and when this area was completed, the top of the manhole was level with the college football field. The drainpipe was then extended 450 feet north, where another manhole was installed by attaching 48-inch pipe vertically to the drainpipe. When this manhole was completed, a reduction cone was inserted in the top of it which reduced its capacity to 24 inches, and a metal grating was placed over the top which further reduced the inflow capacity to 8 inches. This manhole extended 8 to 12 inches above the surface of the completed fill. North of this second manhole the City constructed another dam and installed another manhole to the north of it, approximately 900 feet north of the south dam. During the operation of the landfill north of the third manhole, that manhole would take water only when the water in the pond reached the top of the north dam, unless the City drained the reservoir by tilting the manhole sections so the water would run through.

From 1958 to the summer of 1963 the City operated four compactor garbage trucks and one open-box trash truck. These trucks would bring two and one-half to three loads of garbage and trash apiece to the landfill ravine every working day. Waste lime from the city water treatment plant was also dumped into the ravine. Following each day's dumping, the debris would be covered with earth which had been scraped from the sides of the ravine by the two crawler tractors and a rubber-tired earth scraper which the City kept for use at the site. This scraping and covering were done in the early evening of every working day. As the garbage was dumped during the day it would be compacted into "cells" by the crawler tractors, and these "cells" were what were covered each evening. The fill was made in a series of wedges which were created by working from east to west and west to east across the ravine.

The City, as a result of this landfill operation, materially altered the natural terrain of the ravine by leveling and filling it with garbage and by scraping and stripping the east and west slopes of the ravine, leaving the subsoil exposed and the ravine devoid of vegetation.

When the lower part of the landfill between the City's south dam and the north dam was brought up to final grade, it sloped downward to the north so that its most northerly end was four feet below the level of the top of the college fill.

On the south side of the college football field south of the south dam a riprapped drainage ditch ran east and west along the north side of 11th Avenue, N.W. When the rains came in 1962 and 1963, water from the pipe underlying the landfill flowed in this ditch west along 11th Avenue, then south along 7th Street where 11th Avenue takes a jog to the south, then west to 8th Street, where it turned south and ran down 8th Street, spilling over the plaintiffs' property.

At least five times in the spring and summer of 1962 and seventeen times during the same period in 1963 there was severe flooding on 8th Street south of 11th Avenue, at which times the yards of the plaintiffs were inundated by water up to 14 inches deep. The pressure and flow of this large amount of water caused damage to several of the plaintiffs' basement walls and to various concrete appurtenances, such as stoops, sidewalks, and driveways. It also flooded several basements and garages, causing damage to personal property stored in them. When this water receded, it left behind huge quantities of mud and debris such as cans, cartons, sticks, twigs, lumber, and a white material which had an unpleasant odor.

On at least two occasions during 1963 the water in the landfill ravine was so high that it overflowed both of the dams which the City had constructed and ran out onto 11th Avenue. On one of these occasions, water washing over the south dam created a gully 6 feet deep in the dam itself.

Following each flood the mud became so deep on the street and on the berms of the plaintiffs that City equipment had to be used to remove it. The plaintiffs spent many hours cleaning the mud and debris from their basements, garages, and yards after each flood, and floods occurred in 1963 with as little as .54 inch of rain.

Although the City tried to control the flow of surface water by its dams in the ravine, it appears that the reservoirs during the rains became filled with water which was heavily laden with silt, and that this drained onto the plaintiffs' property, either through the 24-inch drainpipe or by washing over the tops of the dams. In any case, whether or not the water was laden with dirt when it left the landfill ravine, when it merged with the water from north 8th Street it cascaded onto the plaintiffs' property with such force and in such quantity that it carried tons of silt which it deposited on the plaintiffs' property.

It is clear from the holdings of a previous decision of this court and from other authority that such facts support the conclusion that the City has maintained a nuisance for which it is liable for damages.

In Kinnischtzke v. City of Glen Ullin, 79 N.D. 495, 57 N.W.2d 588, a landowner sought damages from the city for the operation of its sewer system and cesspool, by which it caused sewage and offal to be discharged into a creek which flowed through and adjacent to the landowner's premises, thereby polluting the creek and causing the landowner's cattle, which drank from the creek, to become ill, and causing other injuries to the landowner. The court said:

> Negligence may or may not result in the creation of a nuisance, and, on the other hand, a nuisance may be created wholly without negligence. The distinction is set out in 39 Am.Jur., Nuisances, Section 4, thus:
>
> "liability for negligence is based on a want of proper care while, ordinarily, a person who creates or maintains a nuisance is liable for the resulting injury to others regardless of the degree of care or skill exercised to avoid such injury."

\*  \*  \*  \*  \*  \*

We reach the conclusion that where a municipality purposely or negligently so operates a sewage disposal plant that it becomes a nuisance which results in injury to property, the municipality is

liable for damages in an amount sufficient to compensate for the injury.

Kinnischtzke v. City of Glen Ullin, supra, 596–597, 57 N.W.2d 596.

■ It is obvious from what has been quoted from *Kinnischtzke* that this court has previously determined that one need not prove negligence to establish that a nuisance has been maintained. Accordingly, we have not attempted in this case to determine whether the City was negligent.

See also: Ryan v. City of Emmetsburg, 232 Iowa 600, 4 N.W.2d 435; Risher v. Acken Coal Co., 147 Iowa 459, 124 N.W. 764.

The following sections of our Code are pertinent to a consideration of this case:

42–01–01. Nuisance — Definition. — A nuisance consists in unlawfully doing an act or omitting to perform a duty, which act or omission:

1. Annoys, injures, or endangers the comfort, repose, health, or safety of others;

2. Offends decency;

3. Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake, navigable river, bay, stream, canal, basin, public park, square, street, or highway; or

4. In any way renders other persons insecure in life or in the use of property.

42–01–02. Private Nuisance.—Definition.—A private nuisance is one which affects a single individual or a determinate number of persons in the enjoyment of some private right not common to the public.

42–01–03. Private nuisance — Remedies against.—The remedies against a private nuisance are:

1. A civil action; or

2. Abatement.

North Dakota Century Code.

■ By maintaining its sanitary landfill in such a location as to permit the rains to send down onto the plaintiffs' property the surface waters laden with silt and other material, the City rendered the plaintiffs insecure in the use of their property. This constituted a private nuisance, entitling the plaintiffs to bring a civil action for damages.

Because of the importance the City has placed on the evidence relating to possible negligent acts of others, we set forth hereafter some of the facts surrounding concurrent acts of others which may have contributed to the plaintiffs' damages.

North of 11th Avenue, 8th Street runs uphill to the north. During 1962 and 1963 a large amount of construction was going on in the area surrounding the north end of this street, and the sides of the ravine through which 8th Street extends were stripped, scraped, and laid bare of vegetation. During the heavy rains of 1962 and 1963 great amounts of water drained from these slopes onto 8th Street and south to 11th Avenue. The water flowing off the hills eroded huge gullies in the slopes and even cut a rut in 8th Street itself.

On the northwest corner of the intersection of 8th Street and 11th Avenue the City had constructed an L-shaped asphalt dike. This dike was located about 14 inches from the curb, starting on 8th Street and following the curb around the corner onto 11th Avenue for a short distance. The purpose of the dike was to divert water flowing down 8th Street to the west along 11th Avenue.

The great amounts of water which came down 8th Street flooded the whole street. Very little of it was diverted by the asphalt dike. The rest turned east on 11th Avenue, then south on 8th Street. This water was

also heavily laden with silt and merged with the water moving west along 11th Avenue from the landfill ravine.

It was these conjoined flood waters which caused the damage to the plaintiffs' property. The damage was indivisible.

█ Although the defendants who were dismissed from the action through covenants not to sue and others who were not named as party defendants may have contributed to the damages which the plaintiffs suffered (because the damages are the result of the concurrence of the nuisance on the part of the City and possible tortious acts of the others and are of such a nature as to be inseparable), the City, having contributed proximately to the damages, is liable for all of the damages.

Some courts in dealing with concurrent nuisances have held comparable fact situations to lead to divisible damages. For a recent decision so holding see: Sam Finley, Inc. v. Waddell, 207 Va. 602, 151 S.E.2d 347. We believe that these cases are based on an outdated distinction between nuisance and negligence as harm-causing agents.

Section 881 of the Restatement of Torts reads as follows:

Where two or more persons, each acting independently, create or maintain a situation which is a tortious invasion of a landowner's interest in the use and enjoyment of land by interfering with his quiet, light, air or flowing water, each is liable only for such proportion of the harm caused to the land or of the loss of enjoyment of it by the owner as his contribution to the harm bears to the total harm.

In Griffith v. Kerrigan, 109 Cal.App.2d 637, 241 P.2d 296, the plaintiff brought an action against two defendants for damage to his land caused by underground seepage of water from defendants' land. The demurrer of one of the defendants was sustained without leave to amend, and judgment was entered against the other

defendant for the portion of the plaintiff's whole damage found by the court to have been caused by that defendant. Both plaintiff and defendant appealed, the plaintiff claiming that the defendant was liable for the total damage, and the defendant claiming that the plaintiff had not properly proved a basis for apportionment. The California Court of Appeals affirmed the judgment, relying on § 881 of the Restatement, supra.

In Dauenhauer v. Sullivan, 215 Cal.App. 2d 231, 30 Cal.Rptr. 71, the plaintiff sued four defendants for damage to his home caused by excavation of dirt from the defendants' adjoining lands. The jury returned a verdict for $37,000 total damages and then apportioned this amount in unequal shares among the four defendants. The plaintiff appealed, contending that the judgment should have been joint and several against all of the defendants. The Court of Appeals agreed and reversed the judgment, stating:

Appellants, on the other hand, contend that the rule set forth in the cases cited by respondent is totally inapplicable when the acts of the independent tortfeasors have united in causing one single and indivisible result such as the destruction of appellants' house. We agree. * * *

Dauenhauer v. Sullivan, supra, 30 Cal. Rptr. 71, 74.

One of the cases cited by the respondents in *Dauenhauer* was Griffith v. Kerrigan, supra. In distinguishing *Griffith* and other cases the court said:

* * * In determining whether a logical basis for apportionment exists, "The question is whether, upon the facts, it is possible to say that each defendant is responsible for a separate portion of the loss sustained. The distinction is one between injuries which are capable of being divided, and injuries which are not. * * *"

Dauenhauer v. Sullivan, supra, 30 Cal. Rptr. 71, 74.

See also: Puckett v. Sullivan, 190 Cal. App.2d 489, 12 Cal.Rptr. 55, 87 A.L.R.2d 704.

It is significant that § 881 of the Restatement of Torts has been modified:

§ 433A. Apportionment of Harm to Causes

(1) Damages for harm are to be apportioned among two or more causes where

(a) there are distinct harms, or
(b) there is a reasonable basis for determining the contribution of each cause to a single harm.

(2) Damages for any other harm cannot be apportioned among two or more causes.

Restatement (Second) of Torts § 433A, at 434 (1965).

The Reporter's Notes to § 433A read as follows:

This Section has been added to the first Restatement. It expands rules formerly stated in §§ 875, 879 and *881*, which Sections now refer to this one. (emphasis supplied)

Restatement (Second) of Torts, Appendix § 433A, at 138 (1966).

The modification of the rule (as exemplified by § 881, supra) shown by subsection (2) of § 433A, supra, points out what we believe to be the trend of the law in regard to injury resulting from concurrent causes, which injury is incapable of reasonable apportionment. This is certainly so with regard to injury caused by concurrent negligent acts. Cf. Truscott v. Peterson, 78 N.D. 498, 50 N.W.2d 245 (damage to building due to excavation); *Phillips Petroleum Co. v. Hardee*, 189 F.2d 205 (5th Cir. 1951) (damage to rice crops by pollution of stream); Barber v. Wooten, 234 N.C. 107, 66 S.E.2d 690 (personal injury from automobile accident); Meyer v. Cincinnati Street Ry. Co., 157 Ohio St. 38, 104 N.E.2d 173 (personal injuries to

streetcar passenger); Phillips Petroleum Co. v. Vandergriff, 190 Okl. 280, 122 P.2d 1020 (damage to realty by vibration); Murray v. Smithson, 187 Va. 759, 48 S.E. 2d 239 (personal injuries from automobile accident); Bolick v. Gallagher, 268 Wis. 421, 67 N.W.2d 860 (personal injuries from automobile accident).

Professor Prosser says:

Once it is determined that the defendant's conduct has been a cause of some damage suffered by the plaintiff, a further question may arise as to the portion of the total damage sustained which may properly be assigned to the defendant, as distinguished from other causes. The question is primarily not one of the fact of causation, but of the feasibility and practical convenience of splitting up the total harm into separate parts which may be attributed to each of two or more causes. Where a logical basis can be found for some rough practical apportionment, which limits a defendant's liability to that part of the harm which he has in fact caused, it may be expected that the division will be made. Where no such basis can be found, and any division must be purely arbitrary, there is no practical course except to hold the defendant for the entire loss, notwithstanding the fact that other causes have contributed to it. (footnotes omitted)

W. Prosser, Law of Torts § 42, at 247–248 (3d ed.1964).

We find no logical or reasonable basis for apportioning the plaintiffs' total loss in this case.

In the 1918 case of Boulger v. Northern Pac. Ry., 41 N.D. 316, 171 N.W. 632, 634, this court said:

It is well established that, where it appears that part of the damage was caused by a third party or a third cause, the plaintiff, unless a conspiracy or joint tort can be proved, can only recover against the defendant such damages as he

can show were occasioned by the defendants' wrong.

We state herein that that case is not controlling.

■ If it were to be assumed for purposes of argument that the facts are similar, we hold *Boulger* nevertheless not applicable due to the enactment in 1957 of the Uniform Contribution Among Tort-Feasors Act. Nothing within that act, now encompassed by N.D.C.C. Chapter 32–38 restricts its application to situations in which the parties act in concert or act jointly. Quite to the contrary, § 32–38–01 gives the right to contribution to those who have become "jointly or severally liable in tort" for the same injury. That being the case, there is no longer any reason for distinguishing between cases of wrongdoers acting in concert and cases of wrongdoers acting concurrently but not in concert. At common law the release of one joint tort-feasor released all, and contribution was unavailable. As a result, the courts distinguished between cases in which tort-feasors acted in concert and those in which they acted only concurrently, so that a release of one did not release all in the latter situation. With the adoption of the Uniform Contribution Among Tort-Feasors Act such a distinction is no longer necessary.

■ It is also our view that the statute applies even though one of the parties, such as the defendant in this case, became liable as a result of maintaining a nuisance which may have been either with or without negligence.

In Burns v. Lamb, 312 S.W.2d 730 (Tex. Civ.App.1958), the plaintiffs sued Burns for damage to their land caused by salt water escaping from an oil well operated under lease by defendant's decedent. The jury found that Burns permitted salt water to escape onto the plaintiffs' land, that salt water from Shell Oil Company operations and certain other operations also damaged the land, and that the latter damage "could not with reasonable certainty be detected and determined separately from the damage caused by salt water" from Burns's well. Shell Oil and the other operators were not named in the suit. Judgment was rendered for the plaintiffs, and Burns appealed on the basis that there had been no showing of a single indivisible injury caused by two or more negligent or intentional wrongdoers, and thus that he could not be held for the entire damage but could be held only for his share of the damage. In other words, he argued that because Shell Oil and the other operators were not alleged to be nor adjudged negligent wrongdoers as to the plaintiffs, he could not be liable for the entire injury, under the rule that when the tortious acts of two or more wrongdoers join to produce an indivisible injury all of the wrongdoers will be held to be jointly and severally liable for the entire damage, and the injured party may proceed against any one separately or against all in one suit. The Court of Civil Appeals affirmed the judgment, relying on the ground that Shell Oil and the other companies could have been maintaining a non-negligent nuisance. The implication is that it is irrelevant whether other parties who are also causally responsible for damage to the plaintiff are intentional or negligent wrongdoers or are the creators of nuisances; the defendant sued will still be responsible for the total damages and will be left to his chance to recover contribution from the other parties.

In the instant case the trial court found the plaintiffs entitled to awards of damages, not including costs, as follows:

| | |
|---|---|
| Thorson | $ 515.00 |
| Ralston | 777.60 |
| Larcombe | 400.00 |
| Kulaas | 378.77 |
| Graving | 520.00 |
| Melby | 515.00 |
| M. O. Lee | 718.25 |
| Scheffer | 550.00 |
| A. Lee | 500.00 |
| White | 823.18 |
| Fecho | 345.00 |

The trial court was cognizant of the amount of money the plaintiffs received on the covenants not to sue, the covenants having been inserted in the record during the trial. The record further discloses that counsel for the plaintiffs had informed the trial court and the City that the money received for the covenants not to sue, $9,750, would be pro rated according to the recovery in the actions if recovery was made; otherwise, it would be divided among the plaintiffs on the basis of the appraiser's estimate of the plaintiffs' damages. Therefore, it is our view that the awards of damages made by the trial court were intended to fully compensate the plaintiffs by being added to the money paid on the covenants. This view is supported by the fact that the trial court said in its order denying the motion to credit the judgment that the covenants not to sue, having been read into the record during the trial, were considered by it in making its decision.

█ The City's motion to credit the judgment with the money paid on the covenants not to sue was based on § 32–38–04(1), which reads as follows:

When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:

1. It does not discharge any of the other tort-feasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any money stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater * * *.

North Dakota Century Code.

The Supreme Court of Arkansas, in a case in which the jury was informed of the amount of money that the plaintiff had received on a covenant not to sue, referred to that part of the Uniform Contribution Among Tort-Feasors Act which is similar to Subsection 1 of § 32–38–04 of our Code and held that the defendants had obtained the full benefit of that section by introducing into evidence proof of the amount of money that the plaintiffs had received on the covenant, and thus that the defendants were not entitled to have the court, after the verdict, reduce the verdict by the amount of the payment made on the covenant. Giem v. Williams, 215 Ark. 705, 222 S.W.2d 800, 804–805.

In a decision rendered by the Municipal Court of Appeals for the District of Columbia that court said:

Where a jury, unaware of a previous settlement by one tort-feasor, awards a verdict against another tort-feasor, it is logical to assume that the verdict is an appraisal of the entire injury, and it is only fair that the previous settlement be credited against the verdict. In the present case the jury, knowing that appellant had already received $700, must have awarded the $2000 as additional damages necessary to fully compensate appellant. In such case it is not fair to credit the settlement against the verdict. Doing so would result in crediting the settlement twice, once by the jury and again by the court. (footnotes omitted)

Hawley v. Martello, 168 A.2d 529, 531 (D.C.Mun.Ct.App.1961).

It is our view that crediting the money paid on the covenants to the judgments rendered by the trial court would be crediting the settlement twice, once by the court in determining the amounts of the judgments in the first instance and again by the court in reducing the amounts of the judgments by the money paid on the covenants.

The City relies on Levi v. Montgomery, 120 N.W.2d 383 (N.D.1963), to support its position that the judgments should be credited with the money paid on the covenants not to sue. The rule in that case cannot be applied in this case for the reason that the jury in Levi was

not informed of the money paid on the covenant not to sue and thus brought in a verdict for the full amount of the plaintiff's damages. That is not the situation in this case: here the court had knowledge of the consideration paid on the covenants and therefore took it into account in determining the amount of damages that the plaintiffs should receive in the actions. To again credit the amount of the consideration paid on the covenants to the judgments would be to apply § 32–38–04(1) twice. That would not be fair.

As trial de novo has been demanded, we must also decide anew the amount of damages. Giving the trial court's findings appreciable weight in light of our analysis of them, we find the plaintiffs are entitled to damages, in addition to costs, as follows:

| | |
|---|---|
| Thorson | $ 1,343.75 |
| Ralston | 2,035.35 |
| Larcombe | 1,043.50 |
| Kulaas | 983.27 |
| Graving | 1,358.50 |
| Melby | 1,343.75 |
| M. O. Lee | 1,878.50 |
| Scheffer | 1,437.25 |
| A. Lee | 1,309.25 |
| White | 2,149.18 |
| Fecho | 910.50 |
| Total | $15,792.80 |

Applying N.D.C.C. § 32–38–04(1) to these totals leaves a balance owed by the City in each case equivalent to the awards made by the trial court.

It has not been argued on appeal that the trial court erred in dismissing the other defendants, and we find no error in the dismissals.

The judgments of the trial court, including its assessments of costs, and the denials of the motions to credit its judgments with the consideration paid for the covenants not to sue are affirmed, with

the general admonition that in the future the triers of the facts in situations such as that presented here, whether court or jury, not only should determine the full damages but should set forth in the findings or the verdict the full damages and then deduct from them the consideration paid on covenants not to sue, so that all may know from an examination of same that the pertinent provision of N.D.C.C. § 32–38–04 has been complied with.

TEIGEN, C. J., and KNUDSON, PAULSON and STRUTZ, JJ., concur.