Bill LANG and Luella Lang, husband and wife; Chuck Lang and Brenda Lang, husband and wife; and Ed Schlenker and Hazel Schlenker, husband and wife, Plaintiffs and Appellees,

v.

Lloyd WONNENBERG, Defendant, Third–Party Plaintiff and Appellant,

v.

BOONE TOWNSHIP OF SHERIDAN COUNTY, North Dakota, a public corporation, Third–Party Defendant and Appellee.

Civ. No. 890171.

Supreme Court of North Dakota.

April 25, 1990.

Kelsch, Kelsch, Ruff & Austin, Mandan, for plaintiffs and appellees; argued by William C. Kelsch.

Pearce & Durick, Bismarck, for third-party defendant and appellee; argued by Jerome C. Kettleson.

Zuger, Kirmis, Bolinske & Smith, Bismarck, for defendant, third-party plaintiff and appellant; argued by Murray G. Sagsveen.

VANDE WALLE, Justice.

Lloyd Wonnenberg appealed from a district court judgment which awarded Bill and Luella Lang [Bill Lang], Chuck and Brenda Lang [Chuck Lang], and Ed and Hazel Schlenker [Schlenker] approximately $260,000 in damages caused by the unlawful draining of ponds and sloughs on Wonnenberg's property; ordered Wonnenberg to close all improperly opened drains and to restore them to their pre-drain storage capacity; and dismissed Wonnenberg's third-party complaint against Boone Township. We affirm in part, reverse in part, and remand for further proceedings.

Wonnenberg, the Langs, and Schlenker own farmland located in Boone Township in Sheridan County. Wonnenberg owns four quarter-sections of land in the township, three of which are adjacent to and south of a section-line road that is maintained by Boone Township. A large slough, referred to at trial as the "big slough," is located on Wonnenberg's land on the south side of the township road. Bill Lang owns farmland located north and downstream of Wonnenberg's land. Chuck Lang owns a 640–acre farm, some of which is located north and downstream of Wonnenberg's land with the rest located west of it. Schlenker owns farmland located west of Wonnenberg's property and rents this land to Bill Lang.

In 1979 Wonnenberg decided to drain the ponds and sloughs in three of his quarter-sections into the big slough. He planned to have the township road act as a dam to confine the waters to his own land. Wonnenberg hired a contractor to do the work, but he did not seek a permit to drain from the Sheridan County Water Resource Board, did not contact downstream land-owners, did not consult with an engineer or other professional, and did not calculate the water storage capacity of the wetlands he planned to drain. As part of the drainage project, the contractor dug a ditch six-feet deep, five to six-feet wide at the bottom, 100–feet wide at the top, and 200 to 300–feet long. Unknown to Wonnenberg, the ditch breached a divide between two major drain basins—the Sheyenne River basin which flows to Hudson Bay, Canada, and the James River basin, which flows to the Gulf of Mexico. Wonnenberg drained approximately 350 of the 480 acres in the three quarter sections, reducing his wetland surface acreage from 45.2 acres to 8.4 acres.

In 1980 the big slough flooded over the township road, as it had every spring in which substantial runoff occurred. The road was covered with two to three feet of water for a distance of 200 to 300 feet and the Boone Township Board had the road barricaded against passage. The Board held a special meeting, at which Wonnenberg acknowledged that his draining, coupled with heavier than usual August and September precipitation, damaged the township road. The Board and Wonnenberg agreed that Wonnenberg would pay 80 percent of the cost to raise the road so that it would act as a dam and keep the water on his land. During the summer of 1981 Boone Township had Sheridan County personnel raise the road along the north side of the big slough approximately three feet. Neither Wonnenberg nor Boone Township were aware that a plugged culvert was located under the township road in the area of the big slough.

The following two years, 1982 and 1983, were extremely wet years in the area and the runoff was substantial. The water from the drained wetlands flowed into the big slough and was contained by the raised township road. The trial court found that as the water in the big slough rose near the top of the road, it backed up and flowed in a westerly direction flooding portions of property owned by Chuck Lang and Schlenker. In early summer 1983, standing water in the big slough forced open the plugged culvert, releasing a substantial quantity of water. The trial court found that this water caused extensive flooding on downstream farmlands owned by Bill Lang and Chuck Lang. Boone Township had the culvert closed and, since then, the Langs' property north of the township road has not been flooded. The trial court found, however, that the previously-released water increased the size of a large natural wetland from 28.1 acres to 46.9 acres, and caused the land to remain wet and unusable through the drought of 1988. In addition, the trial court found that from 1984 through 1987, the big slough filled with water to the roadtop level and excess water again traveled to the west flooding portions of property owned by Chuck Lang and Schlenker.

The Langs and Schlenker commenced this action against Wonnenberg in August 1987 seeking damages for injury to their farmlands caused by Wonnenberg's draining in violation of either § 61–01–22, N.D. C.C. [currently codified at § 61–32–03, N.D. C.C.], which, under the facts of this case, required a permit to drain, or the reason-

able-use rule, and seeking injunctive relief to require closing of the drains. Wonnenberg brought a third-party action against Boone Township alleging that it "carelessly and negligently failed to improve the roadway sufficiently to act as a dam as the parties agreed...."

After a bench trial, the trial court found Wonnenberg liable to the Langs and Schlenker for violating § 61–01–22. The court found that Boone Township was not negligent and dismissed Wonnenberg's third-party complaint. The court found that the plaintiffs' lands were permanently damaged and awarded Bill Lang $30,880, Chuck Lang $39,585, and Schlenker $27,495 for the diminution in value of their land. Additionally, the trial court awarded Bill Lang $53,961.10 and Chuck Lang $89,594.16 for loss of use of their property during the years 1983 through 1988. The court also found that Wonnenberg acted maliciously and oppressively and awarded the plaintiffs $10,000 in exemplary damages. The court further ordered Wonnenberg to close all the drains he opened in 1979 and restore them to their pre-drain storage capacity and to pay the cost of changing the character of the township road as a dam through the installation of a working culvert.

■ On appeal, Wonnenberg raises numerous issues with regard to liability and damages. Most of his assertions constitute attacks on the trial court's findings of fact. A trial court's findings of fact will not be set aside on appeal unless clearly erroneous, with due regard given to the opportunity of the trial court to judge the credibility of the witnesses. Rule 52(a), N.D.R.Civ.P. A finding of fact is clearly erroneous when, although there is some evidence to support it, the reviewing court on the entire record is left with a definite and firm conviction that a mistake has been made. *KBM, Inc. v. MacKichan,* 438 N.W.2d 181 (N.D.1989). A finding of fact that comports with one of two permissible views of the evidence is not clearly erroneous. *Vogel v. Pardon,* 444 N.W.2d 348 (N.D.1989). While we may have viewed the facts differently if we had been the

trier of fact, we do not reverse the trial court's findings for that reason alone. *Russell Land Co. v. Mandan Chrysler–Plymouth,* 377 N.W.2d 549 (N.D.1985).

### LIABILITY

■ Wonnenberg asserts that the trial court erroneously determined that he was liable to the plaintiffs because their property would have flooded without the additional water drained from his land. He contends that, because 1982 and 1983 were very wet years, it was the unusually high rainfall and runoff that caused the flooding rather than the "insignificant" additional runoff which resulted from his drainage. Wonnenberg, in effect, challenges the trial court's finding of proximate cause and its rejection of his act-of-God defense. Whether Wonnenberg's drainage was the proximate cause of the damage to the plaintiffs' property is a question of fact. *Martin v. Weckerly,* 364 N.W.2d 93 (N.D.1985).

■ In order for Wonnenberg to prevail on the act-of-God defense, he had the burden of establishing by a preponderance of the evidence that the rainfall, runoff, and flooding (1) were unprecedented and extraordinary; (2) could not have been reasonably anticipated; (3) could not have been reasonably provided against; and (4) were the *sole* proximate cause of the damage to the plaintiffs' property. *Hoge v. Burleigh County Water Management Dist.,* 311 N.W.2d 23 (N.D.1981). If an act of God and the negligence of the defendant combine to produce the injury, the defendant is liable. *Dempsey v. City of Souris,* 279 N.W.2d 418 (N.D.1979).

■ The record supports the trial court's finding that the 1982 and 1983 snowmelt, rain, and resulting runoff were not unpredictable or extraordinary. These years were not the wettest on record. Wet cycles, as the trial court reasoned, are foreseeable, should be reasonably anticipated, and will result in more runoff than in dry years. Wonnenberg's drainage was substantial, eliminating approximately 198 acre-inches of storage capacity on his property. After Wonnenberg's drainage, temporary wetlands in the plaintiffs' property

which had a history of drying out early each season became permanent wetlands until the drought of 1988. We conclude that the trial court did not err in rejecting Wonnenberg's act-of-God defense.

■ Wonnenberg also attacks the trial court's finding that the water impounded behind the township road flowed west causing damage to property owned by Chuck Lang and Schlenker. He asserts that this finding is clearly erroneous because a survey done by an engineering firm in December 1988 showed that the highest point in the drainage ditch was higher than the elevation of the reconstructed township road. Because water had not flowed over the township road after it was raised, he contends that it could not have flowed west without topping the road. The trial court relied on the plaintiffs' expert witness who had examined the property in 1984 and reached a contrary opinion. The trial court also relied on testimony of Bill and Chuck Lang that the water did flow in a westerly direction after the road was raised. Moreover, Chuck Lang testified that in the fall of 1988, prior to the survey, he observed Wonnenberg cultivating the drainage ditch areas in such a way as to fill the ditch in part. Because of this, the trial court noted "serious concerns whether the elevations in December 1988 bear any accuracy to the elevations in years preceding." We cannot say the trial court's finding that the water flowed west is clearly erroneous.

■ Wonnenberg asserts that Boone Township's failure to properly construct the township road was an intervening act relieving him of any liability for damages north of the township road. We disagree.

■ In order to relieve a defendant of responsibility for the consequences of his negligence, the intervening cause must be one that severs the connection of cause and effect between the negligent act and the injury. *Wolff v. Light*, 156 N.W.2d 175, 180 (N.D.1968). An intervening cause must be both independent and unforeseeable. *Wolff v. Light, supra.* Boone Township's raising of the road was not independent because it came about as the result of a meeting with Wonnenberg to find a solution to the flooding of the road caused by his draining. Nor was it unforeseeable that, given the substantial amount of drainage done by Wonnenberg, the road might not prevent additional flooding. We conclude that the trial court did not err in finding that Boone Township's acts were not an intervening cause.

■ Wonnenberg also asserts that Boone Township was negligent when it reconstructed the township road and failed to locate the plugged culvert. According to Wonnenberg, it was the hidden culvert, rather than his drainage, that proximately caused any damage to the plaintiffs.

The record reflects that the township supervisors had no information or other indication that there was a culvert in the road until the culvert burst open. Sheridan County kept no records of culvert locations prior to 1957 and Boone Township kept no records of culvert locations. Before the road was raised, three township supervisors borrowed a metal detector from the city of Goodrich and searched for more than one hour to see if a culvert might be located in the road. The metal detector did not disclose the presence of a culvert, and based on the supervisors' collective knowledge of township roads in the area and their visual observations of the road, they determined that there was no culvert in the road. One of the supervisors testified that they had "[n]o reason to believe there was" a culvert in the road and that the only reason they searched for one was "just to double check to make sure there was no culvert." The trial court reasoned that Wonnenberg "was already a tortfeasor in violation of statute when Boone Township got involved ... Boone Township's attempt to locate a culvert and its raising of the road were reasonable under the circumstances, and [it] satisfied its duty of care and [was] not negligent. Wonnenberg was 100% negligent and Boone Township was not negligent at all."

We conclude the trial court's findings that Boone Township was not negligent and that Wonnenberg's acts were the proximate cause of the plaintiffs' damages are

not clearly erroneous. See *Russell Land Co., supra.* Even assuming for purposes of argument that Boone Township was negligent and was a joint tortfeasor in this case, as we discuss in the next section, Wonnenberg introduced no evidence to give the trial court a reasonable basis for apportioning the damages between them.

## DAMAGES

■ Wonnenberg challenges the trial court's award of damages on numerous grounds. Wonnenberg asserts that the district court misapplied § 61–01–22 by holding him liable for 100 percent of the plaintiffs' damages "even if he may have contributed only a small fraction of the water." Section 61–01–22 provided in pertinent part that "[a]ny person draining, or causing to be drained, water of a pond, slough, or lake ... which drains an area comprising eighty acres or more, ... without first securing a permit to do so, ... shall be liable for all damage sustained by any person caused by such draining...." 1977 N.D.Sess. Laws Ch. 566, § 1. Wonnenberg contends that the trial court should have determined what percentage of the damage was caused by his 1979 drainage activities, as opposed to other causes, and limited his liability to that amount.

Section 433A of the Restatement (Second) of Torts (1965)[1] states that damages for harm are to be apportioned among two or more causes only where there are distinct harms or there is a reasonable basis for determining the contribution of each cause to a single harm. See also, Prosser and Keeton, *The Law of Torts* § 52, at pp. 348–352 (5th ed. 1982). The harms to the

plaintiffs' property in this case are not "distinct" and it is questionable whether there is a "reasonable basis" for determining the contribution of each cause in a case such as this. See *Thorson v. City of Minot,* 153 N.W.2d 764 (N.D.1967). In any event, section 433B of the Restatement (Second) of Torts (1965)[2] places the burden of proof as to the appropriate apportionment on the party seeking to limit his liability on the ground that the harm is capable of apportionment. Wonnenberg did not introduce evidence at trial that would have given the trial court a reasonable basis to apportion the damages among various causes. His assertion on appeal that his liability "should have been limited to a small percentage of the total damages" is certainly insufficient to meet this burden. We conclude that the trial court did not err in holding Wonnenberg liable for 100 percent of the damages.

■ Wonnenberg asserts that the trial court misapplied § 32–03–09.1, N.D.C.C., which the parties agreed governs damages in this case. The statute provides:

*"32–03–09.1. Measure of damages for injury to property not arising from contract.*—The measure of damages for injury to property caused by the breach of an obligation not arising from contract, except when otherwise expressly provided by law, is presumed to be the reasonable cost of repairs necessary to restore the property to the condition it was in immediately before the injury was inflicted and the reasonable value of the loss of use pending restoration of the property, unless restoration of the property within a reasonable period of time is

1. *"§ 433 A. Apportionment of Harm to Causes*
"(1) Damages for harm are to be apportioned among two or more causes where
"(a) there are distinct harms, or
"(b) there is a reasonable basis for determining the contribution of each cause to a single harm.
"(2) Damages for any other harm cannot be apportioned among two or more causes."

2. *"§ 433 B. Burden of Proof*
"(1) Except as stated in Subsections (2) and (3), the burden of proof that the tortious conduct of the defendant has caused the harm to the plaintiff is upon the plaintiff.

"(2) Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.
"(3) Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm."

impossible or impracticable, in which case the measure of damages is presumed to be the difference between the market value of the property immediately before and immediately after the injury and the reasonable value of the loss of use pending replacement of the property. Restoration of the property shall be deemed impracticable when the reasonable cost of necessary repairs and the reasonable value of the loss of use pending restoration is greater than the amount by which the market value of the property has been diminished because of the injury and the reasonable value of the loss of use pending replacement."

The trial court noted that the statute "is somewhat more easily applied to personal property than it is to real estate under the circumstances in this case," but found that Wonnenberg's draining caused permanent damage to the plaintiffs' lands and that restoration of these lands "within a reasonable time was impossible." The trial court accepted the valuation of the lands before and after the flooding as testified to by the expert land appraiser for the plaintiffs and awarded the plaintiffs the resulting diminution in value. Wonnenberg asserts that the trial court erred in finding permanent damage to the plaintiffs' lands because the property was "only temporarily flooded" and could be easily restored to its former productivity. Wonnenberg also asserts that the trial court should have applied cost of restoration rather than diminution in value as the measure of damages because cost of restoration would be a lower amount. See *Jablonsky v. Klemm*, 377 N.W.2d 560 (N.D.1985); *Roll v. Keller*, 356 N.W.2d 154 (N.D.1984).

The record contains evidence that the ponds and sloughs on the plaintiffs' property were changed from partial to permanent wetlands and that long-standing water not only destroys tame grasses, but causes the soil to turn "sour" by killing bacteria which are essential for the growing of grasses and crops. Although the 1988 drought caused most of the flood waters to evaporate, the trial court found that the lands are now covered with barren patches of sour soil with intermittent areas of weeds, cattails, reeds, trees, saplings and brush. The trial court's finding that the damage was permanent in nature and that the land could not be restored within a reasonable time is not clearly erroneous.

Moreover, although there is some evidence in the record that the land could possibly be restored to its former condition, neither party presented evidence as to the cost of restoration. Wonnenberg essentially asserts that the plaintiffs had the burden to present evidence of both measures of value and that, here, the plaintiffs failed to carry that burden by presenting evidence only of the diminution in value. However, when either diminution in value or cost of restoration are appropriate measures of damages in a given case, the plaintiff has the right to elect the measure deemed more accurate and if the defendant disagrees, he has the burden to prove the alternative measure is more appropriate. *Meyer v. Hansen*, 373 N.W.2d 392 (N.D.1985). As one court has explained:

> "The nature of the claim that a different measure of damages would yield a lesser award raises a question somewhat akin to mitigation of damages or avoidable consequences; i.e., is the plaintiff receiving no more than is reasonably necessary to remedy fully the injury while avoiding uneconomical efforts. As a 'mitigation' issue, the burden falls upon the defendant to prove that a lesser amount than that claimed by plaintiff will sufficiently compensate for the loss.... Simply stated, the plaintiff need only present evidence as to one measure of damages, and that measure will be used when neither party presents evidence going to the other measure...."

*Jenkins v. Etlinger*, 55 N.Y.2d 35, 447 N.Y.S.2d 696, 698, 432 N.E.2d 589, 591 (1982) [citations omitted]. See also, 22 Am. Jur.2d *Damages* § 402, at p. 489 (1988). Because there is no evidence in the record establishing what the cost of restoration would be, we conclude that the trial court did not err in awarding damages based on diminution in value of the plaintiffs' lands.

██ Notwithstanding that Wonnenberg accepts § 32–03–09.1 as the applicable statute governing damages in this case, he asserts that the trial court erred in awarding damages for loss of use in addition to diminution in value because it results in a double recovery for the plaintiffs. We disagree.

Apart from the apparent legislative sanction for these damages in § 32–03–09.1, it is generally recognized that damages for loss of use may be awarded in addition to diminution in the value of the property. E.g., 22 Am.Jur.2d *Damages* § 414, at p. 497 (1988); Restatement (Second) of Torts § 929 (1979);[3] D. Dobbs, *Handbook on the Law of Remedies* § 5.5, at p. 345 (1973). We have upheld such awards in the past. See *Martin v. Weckerly*, 364 N.W.2d 93 (N.D.1985). In *Weld County Bd. of County Comm'rs v. Slovek*, 723 P.2d 1309, 1317 (Colo.1986), the court reasoned:

"Restoring the owner to his pre-tort position by awarding damages that represent the cost of restoration—or compensating that owner for the loss of market value instead of awarding restoration costs—does nothing to compensate the owner for the loss of the use of the property, if any, during the injurious incident or because of a temporary interference with use caused by the incident and continuing until the injury is repaired. In order to make the owner whole, compensation must be paid for this loss of use if such loss can be established by competent evidence."

The trial court awarded Bill Lang and Chuck Lang damages for loss of use of their property for the years 1983 through 1988. Because of this award, the trial court did not allow interest on the diminution in value award which otherwise would have run from 1983 to the date of payment.

Wonnenberg's drainage reduced the value of the plaintiffs' land and has also resulted in their being unable to make efficient use of that property over the past several years. We conclude that the plaintiffs did not receive a double recovery by being awarded damages representing the loss of use of their property in addition to the diminution in value of the property.

██ Wonnenberg also attacks as speculative the trial court's award to Chuck Lang of $89,594.16 plus interest for loss of income from his cattle operation. This amount stems solely from his loss of a part of his source of hay due to Wonnenberg's drainage which Lang claims resulted in an inability to add 80 cow/calf units to his cattle herd. According to Lang, he had arranged financing with a local banker for the purchase of additional cattle. However, Lang was required to have an adequate source of feed for the cattle he planned to purchase because the banker would not lend funds for that purpose. The trial court found that because of "the loss of the hay from the high-producing wetlands caused by Wonnenberg's draining, and his inability to secure financing to purchase hay for winter feeding, [Lang] lost the opportunity of being able to expand his herd to allow for the efficient use of his facilities."

" 'Where lost profits are recoverable, ... the amount must not be left to speculation or conjecture. The testimony must show with a fair degree of certainty not only the diminution of income or profit but that it is fairly attributable to the wrong complained of.' " *501 DeMers, Inc. v. Fink*, 148 N.W.2d 820, 829 (N.D.1967) [quoting *Platou v. Swanton*, 59 N.D. 466, 230 N.W. 725, 728 (1930) ]. We cannot say that this element of damage is too speculative under

**3.** "*§ 929. Harm to Land from Past Invasions*
"(1) If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for
  "(a) the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred,

"(b) the loss of use of the land, and
"(c) discomfort and annoyance to him as an occupant.
"(2) If a thing attached to the land but severable from it is damaged, he may at his election recover the loss in value to the thing instead of the damage to the land as a whole."

the circumstances. Wonnenberg's draining caused the loss of sufficient hay for feeding the additional cattle, which, in turn, effectively caused Lang to be ineligible for the cattle loan. Lang has shown with a "fair degree of certainty" that this loss is fairly attributable to Wonnenberg's acts.

Nevertheless, the amount of this award is troublesome because Lang's estimate of loss of income to his cattle-raising operation, which was accepted by the trial court, fails to include as a deductible cost of production the principal amount Lang would have had to repay to the bank for the loan to purchase the additional cattle. Chuck Lang testified on cross-examination as follows:

> "Q. [By Mr. Fiergola] Okay. Now, in your computations of the costs associated with these calves that are going to bring you income, have you in any way computed the cost associated with buying the 80 additional cows?
>
> "A. Yes.
>
> "Q. Okay. And where is that figure?
>
> "A. In 1984, I bought some cows and I paid an average of $418 for those cows. We used an average of 550 to be, I guess, generous, I don't know why it makes it generous. We multiply that by 5.5 percent interest rate for what it would cost me, maybe charge me if I would have bought those cows.
>
> "Q. So, the only cost you are computing here is the cost associated with purchasing the cows, not the money that it takes to purchase those cows?
>
> "A. Well, that is what you—like I say, that's the money that was available, the arrangements were made. The only cost would have been—would have been the twelve-and-a-half percent interest on those cows.
>
> "Q. But the money you borrowed to purchase those 80 cows has to be paid back at some point, does it not?
>
> "A. Well, sure. We haven't said what we were going to do with the $89,-594. Supposedly had I had it, it would have went back. And then we are too high on this again. We are figuring it every year by taking that money and

somewhere along that line we should have dropped that 12.5 percent interest. We haven't.

> "Q. At some point we have to use what you refer to as income to pay not only your interest, but you have to pay the principal and the money you borrowed to purchase 80 additional cows, is that correct?
>
> "A. I imagine, yes."

Because Lang's estimate of loss does not factor in the cost to purchase the cattle, we conclude that the trial court erred in awarding Lang $89,594.16 and remand for a recomputation of this award.

■ Wonnenberg asserts that the trial court erred in awarding the plaintiffs $10,-000 in exemplary damages. His first contention in this regard is that because § 32–03–07, N.D.C.C., was suspended by the Legislature from July 8, 1987 through June 30, 1993 [see 1987 N.D.Sess. Laws Ch. 404, § 15], and because § 32–03.2–11, N.D. C.C., became effective on July 8, 1987 and applies only to claims for relief which accrue after that date [see 1987 N.D.Sess. Laws Ch. 404, § 14], there is no legal basis for awarding exemplary damages in this case where the cause of action accrued before July 8, 1987. We reject this contention. Section 1–02–17, N.D.C.C., provides in pertinent part that "[t]he repeal of any statute by the legislative assembly ... does not have the effect of releasing or extinguishing any penalty, fine, liability, or forfeiture incurred under such statute...." Although the terms "suspend" and "repeal" are not synonymous [see Sutherland Stat. Const. §§ 23.30 and 23.33 (4th ed.1985)], "a suspension is, in essence, the repeal of a law for a time certain." *Opinion of the Justices,* 126 N.H. 490, 494 A.2d 261, 267 (1985). We believe that the suspension of a statute constitutes a temporary "repeal" of that statute within the meaning of § 1–02–17. Accordingly, we conclude that § 32–03–07 remains applicable to claims accruing prior to July 8, 1987.

■ Wonnenberg also asserts that the exemplary damage award must be overturned because the plaintiffs did not re-

quest exemplary damages by name in the complaint, but requested them only in a pretrial brief. Assuming, without deciding, that the evidence was such as to warrant a recovery of exemplary damages, we cannot agree with the trial court that the complaint, even construed liberally [see *Jablonsky v. Klemm*, 377 N.W.2d 560 (N.D. 1985)], alleges facts sufficient to warrant a recovery of exemplary damages. While the complaint need not claim exemplary damages by name if it alleges facts that will warrant a recovery of those damages [*Lux v. Bendewald*, 58 N.D. 761, 227 N.W. 550, 552 (1929)], in this instance we cannot conclude that the facts alleged are sufficient to justify a recovery under the general claim for damages. The complaint alleges in Count I that the draining was "unlawful and prohibited conduct" and at Count II, that the draining "was not reasonably necessary" and that Wonnenberg did not take "reasonable care to avoid unnecessary injury to Plaintiffs;" that the draining was done "without regard to the reasonable carrying capacity of Plaintiffs' land;" and that Wonnenberg's draining was "not a reasonable use of the land." We are not prepared to say that "unreasonable" conduct is akin to oppression, fraud, or malice, actual or presumed, as required by § 32–03–07 to support such an award. Intentional or willful conduct is not synonymous with oppressive, fraudulent or malicious conduct [*Bismarck Realty Co. v. Folden*, 354 N.W.2d 636 (N.D.1984)], and, it follows, that allegations of willful and intentional conduct are not sufficient to allege an act which will warrant such a recovery.

The paramount purpose of the complaint is to inform the other party of the nature of the claims being asserted against him and the relief demanded by his adversary. *Vande Hoven v. Vande Hoven*, 399 N.W.2d 855 (N.D.1987). In this instance it was not until the pretrial brief of the plaintiffs that the request for damages by way of punishment was revealed and the basis for that request was that "Some punitive award must be involved, and if not, upstream owners will be free to simply drain their sloughs and pick up all the attendant advantages to their farming operation occasioned thereby, and only have to buy the acres flooded on downstream lands." That argument, standing alone, presupposes exemplary damages for every unwarranted act of drainage, presumably as a matter of law, a position we are not prepared to embrace at this time, particularly where those damages are not sought in the complaint. Although Wonnenberg knew by the time the pretrial brief was filed that exemplary damages were being requested, he resisted those damages, asserting that "Plaintiffs do not allege oppression, fraud or malice, actual or presumed. Plaintiffs also fail to allege facts upon which this court could find oppression, fraud or malice. Most importantly plaintiffs have not pled exemplary damages. The plaintiffs pled their intent to recover compensatory damages only." Although the trial court, in its memorandum decision following trial rejected Wonnenberg's position, we are not convinced that the matter of exemplary damages and the facts upon which the plaintiffs intended to rely were set forth in the complaint sufficiently to give notice to Wonnenberg of the facts upon which plaintiffs intended to rely. We therefore reverse the award of exemplary damages.

In accordance with this opinion, we reverse the award of exemplary damages. We also reverse the trial court's award of $89,594.16 to Chuck Lang for loss of income from his cattle operation and remand for a recomputation of that award. The judgment is in all other respects affirmed.

LEVINE and GIERKE, JJ., concur.

MESCHKE, Justice, concurring and dissenting.

I concur with the majority opinion in holding Wonnenberg liable, in reversing the award of $10,000 for exemplary damages, and in reversing the award of $89,594.16 to Chuck Lang for loss of cattle raising profits. I part company with the conclusion that the plaintiffs did not receive some double recovery from the separate awards for the diminished value of

their land in 1983 (the year of the greatest flooding) as well as for loss of use of part of their land for the succeeding six years, 1983 to 1988.

There are several uneasy aspects about these separate damage awards.

Diminished value damages depend on "permanence"—that is, whether restoration was "impossible or impracticable" "within a reasonable period of time." NDCC 32–03–09.1. Unfortunately, restoration of the productive capacity of flooded land is neither a subject of common knowledge nor of judicial expertise. Still, there are some uncomfortable assumptions in the majority's blithe conclusion that the damage to the plaintiffs' sloughs was "permanent in nature" because there was evidence that long-standing water destroys tame grasses and turns soil "sour" by killing bacteria essential for crops and grasses. One assumption is that the conglomeration of bareness, brush, cattails, reeds, saplings and weeds which appears when a slough first drys out represents an enduring condition. I doubt that.

Because there was only skimpy evidence in this record about how sloughs are returned to production after they have dried out, Wonnenberg's appellate brief resorted to conventional geology rather than the record:

It is common knowledge that North Dakota experiences short-term and long-term weather cycles. These sloughs (and thousands like them) have been alternately flooded and parched since the last ice age. Yet, the wet and dry cycles did not "permanently damage" these sloughs.

There is merit in this argument. Sloughs do dry out and can be put to productive use again.

After all, plaintiffs had sloughs, though smaller, before Wonnenberg's drainage. Moreover, the source of extra water to these sloughs was dried up by the trial court. The trial court enjoined Wonnenberg to restore his land to the original contours and this injunction was not appealed. In the long-run, plaintiffs' sloughs will be affected only by natural runoff, as they were before Wonnenberg's drainage activities. Plaintiffs' increased flooded conditions were not "permanent."

So, "permanent" here means something less than perpetual or everlasting, the primary sense of the word. "Permanent" here implies that the sloughs were not brought back to their previous productive condition "within a reasonable period of time" and that to do so was "impracticable," rather than "impossible," the key ideas in NDCC 32–03–09.1. The trial court must have inferred that it was "impracticable" to restore the sloughs to production because it had not yet been done by trial time in late 1988 after repeated floodings between 1980 and 1983. I say "must have inferred" because there was no direct testimony by any expert that it was either "impossible" or "impracticable."

On the contrary, plaintiffs' expert engineer admitted to the trial court that the land could be restored to its former condition, but did not explain when or how. Wonnenberg's expert engineer testified that the wetlands, "now that they are dry," could be used for agricultural purposes and that they were not "permanently damaged," but he too did not explain when or how they could be restored to their previous productive capacity. Indeed, at the end of the trial and before decision, the trial court asked without getting an answer:

Another thing that bothers me about the plaintiffs' case, there has been no water over it [the sloughs] since 1983.... Why can't this land be reclaimed? What evidence is there that it can't be reclaimed, or that it's impractical in the words of the statute?

In sum, the finding of "permanent damage," which justified a diminished value award, depends on an inference that plaintiffs' sloughs could not be restored to their preexisting condition "within a reasonable period of time." This inference was apparently made from circumstantial evidence that they were not restored within eight years after the first increased flooding or within five years after the most recent flooding added to by Wonnenberg's drain-

age activities. I have difficulty with that finding and I doubt that I would have so found if I had been the trial judge. But as sketchy as the evidence of impracticability of restoration may be, there was the circumstantial evidence that restoration was not done. Therefore, I reluctantly accept that it was not clearly erroneous for the trial court to find that it was impracticable to restore plaintiffs' sloughs within a reasonable time.

Without evidence of the cost of restoring the sloughs to their previous productive capacity, I agree with the majority that the diminished value of the land was the proper measure of damages. Long ago in *Harke v. Ewald*, 51 N.D. 828, 200 N.W. 1009, 1010 (1924), this court suitably explained:

> There is no evidence in the record as to the cost of reparation and, in the absence of such evidence, we are of the opinion it should be assumed that the cost of restoration would be approximately the equivalent of the diminution in value. In other words, where witnesses testify to the diminution in value, it is reasonable to suppose that in forming their judgment they have taken into consideration what it would cost to restore the [property] to its former condition.

Likewise, other factors are reckoned into diminished value. Decreased value normally takes into account the loss of future use of the injured property.

This is another uneasy aspect of these separate awards—the duplication between the diminished value *in 1983* and the decreased profits thereafter until trial in 1988. Comment a of Restatement (Second) of Torts § 929 (1979) makes it clear that this overlap of compensation is inappropriate:

> Recovery for depreciation resulting from a past invasion is, in a legal sense, prospective since it is based upon the fact that the land has lost its present value because of harm to its future use. The effect of the harm upon a reasonable prospective purchaser is the test.... The [injured] condition, though not permanent, would affect the offer of a reasonable purchaser.

While the Restatement does recognize that the "loss of use of the land" can sometimes be recovered in addition to diminished value (or the cost of restoration), the Restatement is careful to caution against duplication of damages. Comment d of Restatement (Second) of Torts § 929 (1979) says:

> In addition to damages for the diminution of the value or other similar elements of damage, the plaintiff is entitled to recover for the past or prospective loss of use caused by the defendant's wrong *as far as this has not been included in the other elements of damages awarded to the plaintiff,* as stated in § 931. Thus if the plaintiff's land has been flooded for a month so that he was unable to use the land, he is entitled to recover for this loss although there was no permanent harm to the land caused by the flood. (Emphasis added).

Here, as I understand the trial court's awards, the diminished value was calculated for 1983. The plaintiffs' appraiser testified that in 1983, the market value of plaintiffs' flooded lands had decreased from $350 and more per acre to next to nothing, or $50 per acre. It was this evidence of the decreased value which the trial court used to fix the damages for diminished value. Besides, the trial court awarded each of the Lang plaintiffs additional damages for loss of income from their wetlands thereafter until trial in 1988. Since loss of future profits was necessarily included in the award for decreased value in 1983, I believe that there was duplication of damages.

The effect of this duplication can be understood by comparing the size of the loss-of-profits awards to the diminished value awards. Bill and Luella Lang received a "permanent damage" award for diminished value of $30,880.00, but their loss of profits award was $56,563.85 for total damages of $87,440. This totalled over $540 per acre for their entire 160 acres, although only 53 acres were flooded or cut off. Before the flooding, the entire 160 acres were valued at $81,520, or only $510 per acre. Wonnenberg must pay more than the value of the

land, yet Bill and Luella Lang get to keep the land, which is now dry.

Similarly, Chuck and Brenda Lang received a "permanent damage" award for diminished value of $39,588, and their loss-of-profits award was $89,594 for total damages of $129,182. Although only 15.1 acres were flooded, the total equals over $200 per acre for their entire farm of 640 acres. The sloughs are now dried out and Chuck and Brenda Lang still have their land. This kind of duplication of damages should not be approved.

The effect is emphasized by the award to Schlenkers. No award for loss of profits was made to them because rent from their land had continued unabated after Wonnenberg's drainage activity—a circumstance which also casts doubt on the "permanence" of the injury. Still, there was no duplication of damages to Schlenkers.

Of course, I realize that the majority opinion reverses the $89,594 award to Chuck and Brenda Lang for loss of profits because it did not properly factor in related and unexpended costs. Yet, recomputation of that award is permitted on remand and loss of profits is being allowed for the time after the diminished value was determined. I would reverse both loss-of-profit awards and remand for recomputation to allow only loss of profits prior to the date at which "permanent damages" were calculated in 1983.

As approved by the majority opinion, there is one saving grace to the damage awards. The trial court did not allow any prejudgment interest for diminished value. This somewhat moderates the effect of duplication of damages, of course, but I believe that, in this case, interest would be a more equitable allowance than the exaggeration of the diminished values by addition of lost profits for five more years.

To that extent, I respectfully dissent.

ERICKSTAD, C.J., concurs.