Linda McLEAN, Plaintiff and Appellee,

v.

The KIRBY COMPANY, a DIVISION OF the SCOTT FETZER COMPANY and the Scott Fetzer Company, Defendants and Appellants,

and

Michael Molachek, Defendant.

Linda McLEAN, Plaintiff and Appellant,

v.

The KIRBY COMPANY, a DIVISION OF the SCOTT FETZER COMPANY and the Scott Fetzer Company, Defendants and Appellees,

and

Michael Molacheck, Defendant.

Civ. Nos. 910230, 910238.

Supreme Court of North Dakota.

July 28, 1992.

**232**

Wold, Jacobs & Johnson, Minneapolis, Minn., for plaintiff and appellee/appellant, Linda McLean argued by Keith D. Johnson. Appearance by Calvin N. Rolfson.

Cahill, Maring & Marquart, Fargo, for defendants and appellants/appellees, Kirby Co. and the Scott Fetzer Co., argued by David S. Maring. Appearance by Daniel Dunn.

MESCHKE, Justice.

The Kirby Company, a division of the Scott Fetzer Company, and Scott Fetzer Company (hereinafter collectively referred to as Kirby) appealed from an amended judgment awarding Linda McLean damages from being raped in her apartment by Michael Molachek, a Kirby dealer. Kirby also appealed from orders denying its post-judgment motions. McLean cross-appealed from the judgment, amended judgment, and an order denying her motion for a partial new trial on her claim for punitive damages. We affirm.

Kirby manufactures vacuum cleaners and sells them through a marketing system of in-home demonstrations by door-to-door dealers. University Vacs, Inc., doing business as Kirby Co. of Fargo–Moorhead, Inc., owned by William L. Urie (hereinafter collectively referred to as Urie) became a Kirby distributor in 1972. Urie hired Molachek as a door-to-door dealer in December 1983. Urie performed no background investigation before hiring Molachek.

Molachek had been unemployed during the year before his employment with Urie as a Kirby dealer. During that year, Molachek was convicted of two assault charges and two weapons charges in Minnesota, and a Minnesota charge of criminal sexual conduct in the third degree was pending when Urie hired him.

On December 8, 1983, McLean let Molachek into her apartment to demonstrate a Kirby vacuum cleaner. Molachek also brought with him a set of knives, provided by the distributor, as a "door opener" or "gift offering" for allowing the in-home demonstration. After beginning the demonstration, Molachek used the knives in assaulting and raping McLean.

McLean sued Kirby, Urie and Molachek. McLean settled with Urie before trial. Molachek did not appear in the action. Liability of Kirby was premised upon the peculiar risk doctrine that is summarized in *Restatement (2d) of Torts* § 413 (1965):

> One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the absence of such precautions if the employer
>
> (a) fails to provide in the contract that the contractor shall take such precautions, or
>
> (b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions.

The jury returned a special verdict that found Kirby and Urie negligent, found the negligence of each proximately caused McLean's damages, attributed 30 percent of the negligence to Kirby and 70 percent to Urie, fixed McLean's damages at $150,000, and determined that McLean should not be awarded exemplary damages against Kirby. Judgment was entered in accordance with the jury verdict. Kirby and McLean appeal.

Kirby raises these questions:

I. DID THE TRIAL COURT ERR IN FAILING TO RULE, AS A MATTER OF LAW, THAT THE COMPLAINT OF THE PLAINTIFF FAILED TO STATE A CLAIM AGAINST KIRBY UPON WHICH RELIEF COULD BE GRANTED?

II. DID THE TRIAL COURT ERR IN FAILING TO RULE, AS A MATTER OF LAW, THAT THE CRIMINAL ACT OF DEFENDANT MICHAEL MOLACHEK WAS A SUPERCEDING CAUSE?

III. DID THE TRIAL COURT ERR IN RULING THAT DEFENDANT MICHAEL MOLACHEK'S FAULT WOULD NOT BE COMPARED?

IV. WAS THERE SUFFICIENT EVIDENCE TO SUPPORT A VERDICT AS AGAINST KIRBY?

McLean raises these questions:

I. DID THE TRIAL COURT ERR IN FAILING TO GIVE INSTRUCTION REGARDING THE MEANING AND DEFINITION OF RECKLESS DISREGARD ALLOWING FOR PRESUMPTION OF MALICE AND AN AWARD OF PUNITIVE DAMAGES?

II. DID THE TRIAL COURT ERR IN GIVING AN INSTRUCTION THAT THE BURDEN OF PROOF FOR PUNITIVE DAMAGES WAS BY CLEAR AND CONVINCING EVIDENCE, RATHER THAN BY A PREPONDERANCE OF THE EVIDENCE?

## I. Kirby's Appeal

### 1. Failure to state a claim.

Kirby asserts that the trial court erred in refusing to rule that McLean's complaint failed to state a claim against Kirby upon which relief could be granted. A complaint should not be dismissed under NDRCivP 12(b)(v), for failure to state a claim upon which relief can be granted, "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Williams v. State*, 405 N.W.2d 615, 620 (N.D.1987). The purpose of a motion to dismiss for failure to state a claim upon which relief can be granted "is to test the formal sufficiency of the statement of the claim for relief; it is not a procedure for resolving a contest about the facts or the merits of the case." 5A C. Wright & A. Miller, *Federal Practice & Procedure: Civil 2d* § 1356 (1990). "The motion to

dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Id.* at § 1357.

We view the complaint in the light most favorable to the plaintiff and in light of NDRCivP 8(a). *Williams v. State.* NDRCivP 8(a) directs that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "The purpose of Rule 8(a), N.D.R.Civ.P., is to put the defendant on notice as to the nature of the plaintiff's claim. If the pleadings indicate generally the type of claim involved, they satisfy the spirit of Rule 8(a), N.D.R.Civ.P." *Williams v. State*, 405 N.W.2d at 621.

### a. duty

Kirby argues that whether one owes a duty of care toward another is a question of law for the court to decide, and that "the trial court should have ruled prior to trial, at the close of Plaintiff's evidence, or at the close of all the evidence, that no duty existed as a matter of law." Whether or not there is a duty is generally a question of law for the trial court, but if "the existence of a duty depends upon factual determinations, the facts must be resolved by the trier of fact." *Madler v. McKenzie County*, 467 N.W.2d 709, 711 (N.D.1991).

This court long ago recognized a duty of care where injury is likely to result unless due precautions are taken:

The rule seems to be well established that where, in the making of an improvement of any kind, it is manifest that injury is likely to result unless due precautions are taken, a duty rests upon him who causes the work to be done to see that all necessary precautions are taken.

*Ruehl v. Lidgerwood Rural Tel. Co.*, 23 N.D. 6, 16, 135 N.W. 793, 795–96 (1912). That decision recognized that the one who caused the work to be done (digging holes for telephone posts) could not escape liability for the death of a child who fell into an unguarded hole on the theory that an independent contractor had dug the holes. This court has also recognized the duty described in *Restatement (2d) of Torts* § 413. *See Schlenk v. Northwestern Bell*

*Tel. Co., Inc.*, 329 N.W.2d 605 (N.D.1983). "Where there is a foreseeable risk of harm to others unless precautions are taken," it is the duty of one who employs another to do work to exercise reasonable care in selecting a contractor "and to provide, in the contract or otherwise, for such precautions as reasonably appear to be called for." *Prosser and Keeton on Torts* § 71, p. 510 (5th ed. 1984).

In ruling on Kirby's motion for summary judgment on McLean's direct negligence claim against it, the trial court stated:

> The issue of a duty owing to the Plaintiff by the Kirby Company and Scott Fetzer Company is not easily resolved; however, the Court is of the opinion that the Plaintiff has established a duty on the part of Kirby Company and Scott Fetzer Company to use reasonable care in seeing that its distributors employ reasonable care in the checking or investigating of the background and fitness of prospective door-to-door salespersons so as to minimize the risk of harm to others.

In ruling on Kirby's posttrial motions, the trial court stated:

> The Court was of the opinion that, pursuant to Section 413, a duty did exist, as a matter of law, upon The Kirby Company and that the Plaintiff had established a prima facie case. Whether the work assigned was a "peculiar unreasonable risk" or that such risk was foreseeable to The Kirby Company were factual matters to be determined by the jury.

The trial court determined that Kirby owed McLean a duty of care and that McLean had established a case for submission to the jury. We conclude that the trial court correctly concluded that Kirby owed a duty to McLean.

Kirby markets its products through in-home demonstrations and sales. When potential purchasers admit Kirby dealers into their homes to demonstrate Kirby products for sales, there is a foreseeable and unreasonable risk of harm to those potential customers if those dealers have past histories of crime and violence. Only by requiring its distributors to investigate potential dealers before hiring them can Kirby re-duce or eliminate this unreasonable risk of harm to potential purchasers of its products. We conclude that the trial court did not err in refusing to rule "that no duty existed as a matter of law."

#### b. *employer not liable for independent contractor's torts*

Kirby argues that Urie was an independent contractor and that, unless there is a valid exception, an employer is not liable for the acts or omissions of an independent contractor. Kirby contends that "[e]xpansive adoption of rules which undermine the advantages of doing business through independent contractors may lead to the demise of this form of business, a form of business that has advantages for both the public and the employer."

"We adhere to the general rule that an owner (employer) is not vicariously liable for the torts of the independent contractor or its employees." *Lumpkin v. Streifel*, 308 N.W.2d 878, 880 (N.D.1981). In *Schlenk v. Northwestern Bell Tel. Co., Inc.*, 329 N.W.2d at 608, this court said:

> Our court has recognized the general rule that an employer is not liable for acts or omissions of its independent contractor. It has been stated, however, that the general rule of employer nonliability "is now primarily important as a preamble to the catalog of its exceptions".

(Citations omitted.) This case involves an exception.

Courts have created exceptions to the general rule of employer nonliability for several reasons:

> A number of considerations have led courts to depart from the rule of nonliability of an employer for the torts of an independent contractor. Some of the principal ones are that the employer is the one who primarily benefits from the contractor's work, the employer selects the contractor and is free to insist on a competent and financially responsible one, the employer is in a position to demand indemnity from the contractor, the insurance necessary to distribute the risk is properly a cost of the employer's busi-

ness, and the performance of the duty of care is one of great public importance. *Aceves v. Regal Pale Brewing Co.*, 24 Cal.3d 502, 156 Cal.Rptr. 41, 44, 595 P.2d 619 (1979). *Aceves* involved liability pursuant to the doctrine stated in *Restatement (2d) of Torts* §§ 413, 416. As the court said in *Majestic Realty Assocs., Inc. v. Toti Contracting Co.*, 54 N.J.Super. 419, 149 A.2d 288, 294 (1959), about the liability of a landowner that had employed an independent contractor to do demolition work: "[T]here is little to be said for a rule which leaves an innocent plaintiff remediless while the owner, who by hypothesis is held to have anticipated the harm which has occurred, is free to disclaim responsibility by having entrusted the work to a contractor."

This court has recognized exceptions to the general rule of employer nonliability where "injury is likely to result unless due precautions are taken," *Ruehl v. Lidgerwood Rural Tel. Co.*, 135 N.W. at 795–96; where there is a "peculiar risk of physical harm to others unless special precautions are taken" per *Restatement (2d) of Torts* § 416, *Peterson v. City of Golden Valley*, 308 N.W.2d 550 (N.D.1981); and where there is a "peculiar unreasonable risk of physical harm to others unless special precautions are taken" per *Restatement (2d) of Torts* § 413, *Schlenk v. Northwestern Bell Tel. Co., Inc.*, 329 N.W.2d 605 (N.D. 1983). The doctrine described in *Restatement (2d) of Torts* § 413 imposes personal or direct liability upon an employer "for failure to act in a reasonable manner in providing for precautions to be taken in work that involves a peculiar unreasonable risk of physical harm to others." *Schlenk*, 329 N.W.2d at 611 n. 4. This doctrine is a valid exception, already recognized, to the general rule of employer nonliability for the acts or omissions of an independent contractor.

#### c. *peculiar unreasonable risk*

Kirby contends that, as a matter of law, the door-to-door sale of vacuum cleaners does not create a peculiar unreasonable risk of harm. A more appropriate focus in this case is whether the "work" that Kirby engaged Urie to do—the recruitment and hiring of dealers for in-home demonstration and sale of Kirby vacuum cleaners—is work that Kirby "should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken." As McLean states in a brief:

> The recruitment of dealers by distributors was likely to create "a peculiar unreasonable risk of physical harm" if it resulted in the presence of a person with criminal or dangerous propensities in a person's home. "Special precautions" in the form of reasonable investigation of an applicant's background would minimize the risk of recruiting a dealer with criminal or dangerous propensities. The Kirby Company recognized the "peculiar unreasonable risk of harm," that "special precautions" would minimize the risk, and its knowledge in this regard was superior to that of the distributors.

McLean asserts that Kirby had a duty to require its distributors to take such precautions, or otherwise exercise reasonable care to provide for the taking of such precautions, and that Kirby breached that duty.

■ An employer's placement of an employee in the home of another may create a risk of harm to the occupant if precautions are not taken in selecting the employee. This is illustrated by such cases as *Ponticas v. K.M.S. Investments*, 331 N.W.2d 907 (Minn.1983) (tenant raped by apartment manager who gained access with a passkey); *Kendall v. Gore Properties, Inc.*, 236 F.2d 673 (D.C.Cir.1956) (tenant killed by a painter engaged by an apartment building resident manager, who gave the painter a key and unrestricted access to the tenant's apartment); *Williams v. Feather Sound, Inc.*, 386 So.2d 1238 (Fla.App.1980) (guest in a condominium assaulted by a maintenance worker given passkeys); *Fleming v. Bronfin*, 80 A.2d 915 (D.C.App. 1951) (woman assaulted in her apartment by a grocery deliveryman). These illustrative decisions say that liability may be imposed on the employer for not taking proper precautions.

Kirby asserts that *"Restatement § 413* has almost exclusively been utilized as a theory of potential liability in construction injury cases." However, the doctrine stated in *Restatement (2d) of Torts* § 413 was also the basis of liability in *Wilson v. Good Humor Corp.,* 757 F.2d 1293 (D.C.Cir.1985). In that case, a child died as a result of being struck by a car as she responded to a Good Humor ice cream vendor who parked his truck on a street and began "ringing the distinctive Good Humor jingle bells." *Id.,* at 1296. Good Humor had sold ice cream products in the streets for many years through vendors who were Good Humor employees. Before this accident, Good Humor converted its vendors to independent contractors and abandoned the extensive safety program it had previously maintained. The court determined that Good Humor was liable under the § 413 doctrine, explaining:

> Section 413 of the *Restatement* supports direct liability if the employer has reason to know that the independent contractor's work is likely to create a peculiar risk to others absent special precautions and if the employer takes no steps to minimize that risk by contract or otherwise.... The *Restatement* defines a "peculiar risk" as a risk "peculiar to the work to be done, and arising out of its character, or *out of the place where it is to be done,* against which a reasonable [person] would recognize the necessity of taking special precautions."

(Citations omitted.) *Good Humor* at 1304–05.

> The vendors do not possess any special experience or knowledge concerning the risks peculiar to their task. Good Humor, by contrast, has special and detailed knowledge of the peculiar risks to children involved in its operation and is in the best position to ensure reasonable safety awareness. Despite its concededly extensive knowledge of those risks, moreover, Good Humor has apparently *chosen* to disclaim responsibility for warning its vendors or for taking any precautions whatsoever against the known and specific dangers to children who purchase ice cream from their vendors.

*Id.* at 1306.

> Accordingly, we hold *only* that, under the circumstances of this case, Good Humor cannot insulate itself from liability in its own field of business when it engaged vendors to sell Good Humor products from the curbside, knew or had special reason to know of the risks to children inherent in its operation, and flatly refused to take *any* steps designed to minimize those risks, including warning its vendors. Under these circumstances, we conclude that the plaintiffs are entitled to a jury determination on Good Humor's liability under the peculiar risk doctrine.

*Id.* at 1307–08. Many of the reasons underlying *Good Humor* exist in this case as well.

Kirby had "reason to know that the independent contractor's work is likely to create a peculiar risk to others absent special precautions." Kirby took "no steps to minimize that risk by contract or otherwise." Urie had no special experience or knowledge about the risks peculiar to its task. Kirby had special knowledge of the peculiar risks to potential customers and was "in the best position to ensure reasonable safety awareness." Kirby disclaimed responsibility for warning Urie or for taking any precautions against the dangers to which potential purchasers of Kirby products were exposed. We conclude that the work done by Kirby's independent distributors on behalf of Kirby involves a peculiar unreasonable risk of physical harm as a matter of law.

#### d. foreseeability

Kirby argues that it was not foreseeable that the work assigned to Urie would create a peculiar unreasonable risk of physical harm. Decisions dealing with liability based upon an employer's negligent selection of an employee, including *Fleming v. Bronfin, Kendall v. Gore Properties, Inc., Ponticas v. K.M.S. Investments, Williams v. Feather Sound, Inc.,* and *D.R.R. v. English Enterprises, CATV,* 356 N.W.2d 580

(Iowa App.1984), illustrate the foreseeability of a risk of physical harm to a person into whose home an employer sends an employee without taking proper precautions in selecting the employee. Interestingly, the court in *Good Humor,* 757 F.2d at 1309, also referred to negligent selection: "Under some circumstances, this aggressive indifference to the fitness of its vendors might well subject Good Humor to liability under a negligent selection theory."

In *Fleming v. Bronfin,* a woman was assaulted in her apartment by a grocery deliveryman. The plaintiff sued for negligent selection and retention of the deliveryman. In reversing a directed verdict for the defendants, the court said, 80 A.2d at 917: "The duties of such employee carried him into homes where likely there would be women and children alone and unprotected and it was defendants' duty to use reasonable care to select one reasonably fit to perform such duties."

In *Kendall v. Gore Properties, Inc.,* a tenant was killed by a painter hired by an apartment building resident manager, who gave the painter a key and unrestricted access to the tenant's apartment. The administratrix of the tenant's estate sued for negligent hiring and supervision of the painter. In reversing a directed verdict for the defendants, the court said, 236 F.2d at 678:

> Slight care might be expected as to the employment of a yard man, not ordinarily to be sent into a tenant's apartment. But a very different series of steps are justified if an employee is to be sent, after hours, to work for protracted periods in the apartment of a young woman tenant, living alone.
>
> ... She was entitled to assume that appellees would introduce no intruder into her apartment. She had a right to expect that the landlord would not give up his set of keys to a stranger or so negligently fail to guard them that they might fall into the hands of one bent on mischief....
>
> To say that appellees may fail to make even the most cursory inquiry concerning

[the painter] and then be allowed to excuse themselves in their ignorance is to say that their recklessness will be exalted.

In *Ponticas v. K.M.S. Investments,* 331 N.W.2d at 907, a tenant was raped in her apartment by an apartment manager who gained access with a passkey. The plaintiff sued the owner of the apartment complex, K.M.S. Investments, and the manager of the complex, Skyline Builders, for negligently hiring the apartment manager and issuing him a passkey to all units. In affirming a judgment against the defendants, the Minnesota Supreme Court said:

> Liability is predicated on the negligence of an employer in placing a person with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position in which, because of the circumstances of the employment, it should have been foreseeable that the hired individual posed a threat of injury to others.
>
> ... The rationale employed in ... cases ... involving [employees] who gain access to a dwelling by virtue of their employment, is that since plaintiff comes in contact with the employee as the direct result of the employment, and since the employer receives some benefit, even if only a potential or indirect benefit, by the contact between the plaintiff and the employee, there exists a duty on the employer to exercise reasonable care for the protection of the dwelling occupant to retain in such employment only those who, so far as can be reasonably ascertained, pose no threat to such occupant.
>
> ... We ... hold that an employer has the duty to exercise reasonable care in view of all the circumstances in hiring individuals who, because of the employment, may pose a threat of injury to members of the public. Here, the respondent Stephanie Ponticas met Graffice as a direct result of his employment as apartment manager, and appellants received a benefit from Graffice's employment in having a caretaker for upkeep of the property and to aid tenants with complaints of property malfunction.

Therefore, we hold that these appellants owed to the tenants ... the duty of exercising reasonable care in hiring a resident manager.

331 N.W.2d at 911. The court elaborated, 331 N.W.2d at 913:

[W]hen the prospective employee is to be furnished a passkey permitting admittance to living quarters of tenants, the employer has the duty to use reasonable care to investigate his competency and reliability prior to employment.

In *Williams v. Feather Sound, Inc.*, a guest in a condominium was assaulted by a maintenance worker who had been given passkeys. In reversing a summary judgment in favor of the defendant in the plaintiff's suit for negligent hiring, the court said, 386 So.2d at 1240: "If an employer wishes to give an employee the indicia of authority to enter into the living quarters of others, it has the responsibility of first making some inquiry with respect to whether it is safe to do so."

In *D.R.R. v. English Enterprises, CATV*, 356 N.W.2d 580 (Iowa App.1984), a woman was raped in her apartment by a cable TV installer who had been hired by English Enterprises, CATV, which had contracted to furnish personnel to connect American Heritage Cablevision, Inc.'s, cable system to the television sets of individual residents. There was evidence that the installer had entered the woman's apartment with a master key. In reversing a summary judgment in favor of the defendants in the victim's negligent hiring action, the court said, 356 N.W.2d at 584:

We conclude that this evidence of access to a master key through employment with English, if true, is sufficient to create a special duty owed to plaintiff.... We therefore conclude there is a genuine issue of material fact whether English provided master keys to installers, thus creating a special duty to plaintiff, and whether the hiring of Logston without checking his criminal record was a breach of that special duty.

A similar question of fact exists with regard to American, even though English was an independent contractor.

■ These decisions demonstrate that there is a foreseeable risk of harm to the occupant when an employer allows an employee to enter a dwelling without first investigating the employee's fitness to enter. A dwelling is "a place traditionally associated with safety, privacy, and sanctity." Cindy M. Haerle, Minnesota Developments, 68 Minn.L.Rev. 1303, 1317 (1984). An employer is subject to liability for negligently hiring an unfit employee without a prior investigation of the employee's fitness for entry into dwellings.

■ These decisions also demonstrate that a risk of harm is foreseeable to one who employs an independent contractor to hire employees and provide them with access to dwellings on the employer's behalf. The foreseeable risk of harm to the occupant of a dwelling is "a peculiar unreasonable risk of physical harm ... unless special precautions are taken," within the doctrine described in *Restatement (2d) of Torts*, § 413. Comment *b* to § 413 defines a special risk as one "peculiar to the work to be done ... against which a reasonable man would recognize the necessity of taking special precautions."

■ In addition to the foreseeability that has been judicially recognized in the decisions discussed here, Kirby also had particularized knowledge that the risk of harm in this case was foreseeable and should have been recognized by Kirby. "[T]he extent of the employer's knowledge and experience in the field of work to be done is to be taken into account." *Restatement (2d) of Torts* § 413, Comment *f.* *Aceves v. Regal Pale Brewing Co.*, 156 Cal.Rptr. at 44, 595 P.2d at 622, discussed earlier, said: "The determination of whether a danger is recognizable requires consideration of the employer's knowledge and experience in the field of work to be done."

Kirby relies on the following portion of a deposition of Susi Schieve, Customer Relations Manager in charge of the Customer Complaint Department from 1966 through 1988, to support its assertion that Kirby employees did not believe there was a peculiar risk of harm:

Q. Based on the criminal conduct that you became aware of during the course of your employment as customer relations manager, did you recognize that there was a possibility that crimes would be committed by dealers against persons in their homes?

A. To be truthful, no.

Q. Why didn't you recognize that as a possibility in light of the rape incident that you became aware of and in light of the half dozen incidents, approximate half dozen incidents of criminal conduct that you were aware of before January 1 of 1984?

&ast; &ast; &ast; &ast; &ast; &ast;

THE WITNESS: I find it very unlikely to consider this by virtue of the volume of demonstrations and based on the number of complaints we receive.

&ast; &ast; &ast; &ast; &ast; &ast;

Applying the number of contacts daily in the home of a consumer and the number of complaints we receive, these chances are minimal.

This testimony indicates that Schieve did not believe that the chances of a customer being the victim of a crime committed by a Kirby dealer in the customer's home were numerically high in relation to the total number of customers contacted by Kirby dealers. Still, this testimony confirms that Kirby's Customer Relations Manager was aware that a number of crimes, including a rape, had been committed by Kirby dealers in customer's homes.

Gene Windfelt, who became a dealer in 1964 and Chief Executive Officer of Kirby in 1988, testified that in 17 years as a distributor, he received two complaints about theft by his dealers from a customer. One of the complaints was determined later to be in error. Windfelt also testified that "over a 24–year span" he knew of one instance in which a woman alleged that "she was accosted" by a dealer. Larry Nichols, who began servicing and selling Kirby vacuum cleaners in 1965 and eventually became the Training Coordinator for Kirby, testified that he was aware of one incident of an alleged crime being committed in a customer's home. This incident involved the theft of a watch or ring. This testimony also indicates that highly placed Kirby personnel were aware that Kirby dealers had committed crimes in customer homes.

■ Kirby has promulgated a dealer application form that inquires about criminal convictions. Such a question on an application form evidences knowledge of risk. *See Ponticas v. K.M.S. Investments*, 331 N.W.2d at 914: "The record indicates that appellants were aware of possible risk of hiring a caretaker with a history of criminal activity in that the application form contained a question concerning the same."

As McLean also stated in her brief, without contradiction by Kirby:

In its Professional Management Training Program between 1981 and 1983 for new distributors, the Kirby Company recognized and taught that inquiry of an applicant concerning his background, employment history and criminal record history, obtaining and contacting references and prior employers, and analyzing the information obtained, including analyzing gaps in employment, were important in screening dealers.... In this training program, the Kirby Company recommended that distributors contact the "authorities" and local police departments in doing background checks on dealers (T. 217).

McLean also asserted, without dispute, that this training was intended for new distributors only and that Urie did not receive this training.

We conclude that there was evidence of a foreseeable risk of physical harm to Kirby customers from dealers whose backgrounds were not investigated for fitness to enter customers' homes. We further conclude that there was evidence that highly placed Kirby personnel had particularized knowledge from which a court or jury could reasonably infer foreseeability.

### e. special verdict

Kirby contends that the trial court "did not rule, as a matter of law, that Kirby owed a duty to the Plaintiff based on *Re-*

*statement* § 413 ... [and] did not submit factual issues to the jury for determination upon which a finding of duty could be made." We have concluded that, based on the doctrine summarized in *Restatement* § 413, the trial court properly determined that Kirby owed McLean a duty of care and that McLean had established a case for submission to the jury.

■ Kirby requested that the trial court submit the following special verdict interrogatories to the jury:

5. On or before December 8, 1983, did the door-to-door sale of vacuum cleaners pose a "peculiar unreasonable risk" of physical harm to customers unless special precautions were taken?

6. If so, should it have been foreseeable to Kirby, on or before December 8, 1983, that the door-to-door sale of vacuum cleaners posed a "peculiar unreasonable risk" of physical harm to customers unless special precautions were taken?

Instead, the court submitted a special verdict inquiring only if Kirby was negligent and, if so, was its negligence a proximate cause of McLean's damages.

■ The pertinent part of NDRCivP 49(a) says: "The court in its discretion may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact." The trial court has broad discretion over the nature and scope of written questions submitted to the jury. *Sadler v. Basin Elec. Power Coop.*, 431 N.W.2d 296, 301 (N.D.1988). As that precedent states, "appellate review is limited to determining whether or not there was an abuse of discretion" in the nature and scope of the written questions submitted to the jury.

The trial court instructed the jury on peculiar unreasonable risk and on foreseeability. In ruling on a post-trial motion, the trial court explained:

Whether the work assigned was a "peculiar unreasonable risk" or that such risk was foreseeable to The Kirby Company were factual matters to be determined by the jury. Moreover, the Court did not determine that the jury must, by interrogatory, determine each of the essential elements of the duty imposed upon The Kirby Company. The Court determined that the jury was capable of determining ultimate fact.

In light of the trial court's instructions to the jury, the court's knowledge of the issues and evidence, and the court's ability to assess the capabilities of the jurors, we conclude that the trial court did not abuse its discretion in submitting the special verdict interrogatories.

### *f. breach of duty*

■ Kirby contends that it did not breach a duty owed to McLean under the doctrine summarized in *Restatement (2d) of Torts* § 413. Under that doctrine, one who employs an independent contractor to do work likely to create a "peculiar unreasonable risk of physical harm to others unless special precautions are taken" is not subject to liability if the employer (a) "provide[s] in the contract that the contractor shall take such precautions" or (b) "exercise[s] reasonable care to provide in some other manner for the taking of such precautions." Relying on its distributor agreement with Urie and on decisions holding that an employer may restrict its liability under the § 413 doctrine by providing in the contract that the independent contractor will take the necessary precautions, Kirby argues that "[t]he trial court should have ruled, as a matter of law, that Kirby properly delegated to the independent contractor the duty to take the necessary precautions to guard against any risks that may be associated with door-to-door sales." We disagree.

The relevant parts of Kirby's distributorship agreement with Urie say:

5. *Distributor's Primary Obligations:* Distributor shall use its best efforts in (1) promoting, maintaining and increasing the in-home sale and use of Kirby Products in the Area, and (2) providing complete, convenient and qualified service to all users of Kirby Products in the Area. All such efforts shall be (1) in accordance with the purposes stated at the outset of this Distributor Agreement and all policies of the Company as such

policies may be established or revised from time to time by the Company, and (2) in complete compliance with all federal, state and local statutes and ordinances, and in particular Distributor shall attempt to comply with the rules and regulations of the Federal Trade Commission of the U.S. Government. Except as expressly provided in this Distributor Agreement, all obligations to be performed by Distributor shall be at Distributor's sole cost and expense.

\* \* \* \* \* \*

10. *Relation of Parties.*

(a) The relationship established by this Distributor Agreement is that of vendor and vendee, and all obligations to be performed by Distributor under this Distributor Agreement shall be performed by it as an independent contractor. Except as expressly provided in this Distributor Agreement, the Company shall exercise no control over the selection of Distributor's customers, employees, agents or representatives. The full cost and responsibility for hiring, firing and compensating employees of Distributor shall be borne by Distributor.

This contract language is not reasonably susceptible of a construction that Kirby imposed upon Urie a duty to take the special precautions necessary to ensure that its recruitment and hiring of dealers for in-home demonstration and sale of Kirby vacuum cleaners would not create a peculiar unreasonable risk of physical harm to people who admit Kirby dealers into their homes. This language has nothing to do with recruiting precautions and gives no indication that Kirby was requiring Urie to take any precautions in recruiting and hiring dealers.

■ Kirby also contends that it "took reasonable and appropriate measures in recommending a course of conduct for distributors", that it "exercised reasonable caution," and that it "should not be held liable under *Restatement* § 413." In its brief, Kirby explains:

Kirby conducted both Dealer Power Specialist (DPS) programs and Professional Management Training (PMT) programs. These programs were designed to provide guidance to distributors on proper procedures in establishing and running their businesses. Both Urie and Speaks [a Urie employee] attended at least one of these programs. Mr. Nichols was the Training Coordinator for Kirby during this period. He conducted seminars for the DPS and PMT programs. In conducting these seminars, Mr. Nichols provided written materials that the distributors would take back to their businesses. He would also make an oral presentation, summarizing the written materials. The written materials included recommendations in the following areas: the use of an application asking about criminal convictions; the need to conduct background and employment reference checks; the manner in which to conduct interviews with prospective dealers; and the techniques for screening applicants.

(Transcript citations omitted.) McLean, in her brief, responds to this argument:

Urie was not required or recommended by contract or policy to do background inquiry or investigation, received no training on how to conduct background inquiry or investigation, and received no warning or notice from the Kirby Company about incidents where dealers committed crimes in homes. The Kirby Company did not inquire in any way regarding distributors' recruiting practices.

\* \* \* \* \* \*

This training [on background checking] was provided at a cost, and was intended for and attended primarily by new distributors only. Urie and Speaks never received such training or attended this program.... [T]he seminar Nichols conducted was about "getting [applicants] in the door," but not about background inquiry or checking.

\* \* \* \* \* \*

The Kirby Company provided absolutely no policies, recommendations, training, suggestions or instructions to Urie or Speaks on interviewing applicants regarding their background or in screening

applicants (including whether and how to inquire regarding past criminal history, how to ask questions about an applicant's background, what or how to ask about a person's prior employment), the type of application form to use, how to review an application form, the significance of gaps in a person's employment, obtaining and checking references, or otherwise doing background inquiry and investigation of applicants.

(Transcript citations omitted.) This conflicting evidence created a question of fact for the jury to determine whether Kirby exercised reasonable care, under the circumstances, for the taking of such special precautions as were necessary to ensure that the recruitment and hiring of dealers for in-home demonstration and sale of Kirby vacuum cleaners would not create a peculiar unreasonable risk of physical harm to people who admit Kirby dealers into their homes.

### g. conclusion

We conclude that the trial court did not err in refusing to rule, as a matter of law, that McLean's complaint failed to state a claim upon which relief could be granted.

### 2. Superseding cause.

■ The second question raised by Kirby is whether the trial court erred in refusing to rule, as a matter of law, that Molachek's criminal act was a superseding cause of McLean's injury. Relying on *Hilligoss v. Cross Cos.*, 304 Minn. 546, 228 N.W.2d 585 (1975), where the court found that the criminal act involved was not foreseeable and, therefore, was an intervening efficient cause, Kirby contends: "As a matter of law, Kirby was not in a position to foresee that Urie's dealer would commit a criminal act. Since the act was not foreseeable, it amounts to a superceding, intervening cause." We disagree.

The court in *Hilligoss* observed that, "to be a legally sufficient intervening cause, the criminal act itself must not be reasonably foreseeable." *Id.* 228 N.W.2d at 586. In *First Trust Co. v. Scheels Hardware & Sports Shop, Inc.*, 429 N.W.2d 5, 8 (N.D. 1988), we said that "[t]he intervening negli-

gence of another cannot be a superseding cause which extinguishes a tortfeasor's liability if that negligence was a foreseeable consequence of the situation created by the tortfeasor." In *Lang v. Wonnenberg*, 455 N.W.2d 832, 837 (N.D.1990), we said: "An intervening cause must be both independent and unforeseeable."

In *Ponticas v. K.M.S. Investments*, a tenant was raped in her apartment by an apartment manager who gained access with a passkey issued to him by the manager of the apartment complex. The tenant sued the owner of the apartment complex and the manager of the complex for negligent hiring. On appeal, the defendants contended that the trial court erred in refusing to instruct the jury on superseding intervening cause. The court ruled:

The inherent nature of a negligent hiring cause of action precludes the application of superseding intervening cause. By its definition, the factfinder—the jury—has already determined the injury-causing conduct of the employee was foreseeable.... Moreover, in negligent hiring cases the alleged intervening cause was created by the original negligence.... We conclude, therefore, there was no error in the trial court's refusal to instruct the jury on superseding intervening cause.

331 N.W.2d at 915–16. The same is true in an action seeking to impose liability under the doctrine described in *Restatement* § 413. Here, the risk of physical harm to the occupant of a dwelling who admits a dealer without Urie or Kirby having taken special precautions, such as first investigating or requiring an investigation of a potential dealer's fitness for such access, was foreseeable. The alleged intervening cause, Molachek's criminal act, was created by the original negligence of Urie and Kirby.

Kirby contends:

Molachek did not identify himself as a vacuum cleaner salesman *before* McLean allowed access to her apartment.

The opportunity for Molachek to commit a rape was not presented by Kirby.... Molachek was carrying only a briefcase

and did not get a vacuum until after she had allowed him in the apartment. The presence of the vacuum cleaner had nothing to do with the entrance into the apartment nor the crime. The criminal act is a superseding, intervening cause.

McLean responds:

McLean's testimony established that, while she may have opened the door before knowing that Molachek was a Kirby vacuum cleaner salesperson, she did not allow entrance into the apartment until after he had identified himself as a Kirby dealer and requested the opportunity to enter for a demonstration (T. 565). Molachek's "status" as a Kirby dealer was the sole reason McLean unsuspectingly allowed him into her apartment.

McLean testified that Molachek told her that he was selling or demonstrating Kirby vacuum cleaners before she opened the door. McLean also testified:

[M]y sister, Charlene had just bought a Kirby vacuum cleaner. And also a friend of mine, Jackie Senf, had purchased a Kirby vacuum cleaner. They both had demonstrations in their home. Jackie just loved her vacuum, said, "You will have to buy one."

The jury could reasonably find from the evidence that Molachek would not have been admitted to McLean's apartment and would not have been able to commit his crime if he had not been a Kirby dealer.

A juror could reasonably infer that Molachek's status as a Kirby dealer was as much the key to his entry into McLean's apartment as the passkeys involved in cases like *D.R.R. v. English Enterprises, CATV, Ponticas v. K.M.S. Investments,* or *Williams v. Feather Sound, Inc.;* the apartment key in *Kendall v. Gore Properties, Inc.;* or the groceries in *Fleming v. Bronfin.* So, the jury could reasonably find from the evidence that Urie and Kirby created the opportunity for Molachek to assault McLean and, by failing to take or to require special precautions in the hiring of dealers, created the peculiar unreasonable risk of physical harm that was visited upon McLean.

We conclude that the trial court did not err in refusing to rule, as a matter of law, that Molachek's criminal act was a superseding cause of McLean's injury.

3. Comparing Molachek's fault.

Kirby contends that the trial court erred in ruling that Molachek's fault would not be compared with that of Urie and Kirby.

The trial court submitted the case to the jury to attribute the negligence of Urie and Kirby under the statute that was in effect at the time of McLean's rape:

Contributory negligence does not bar recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or in injury to a person or property, if such negligence was not as great as the negligence of the person against whom recovery is sought, but any damages allowed must be diminished in proportion to the amount of negligence attributable to the person recovering. The court may, and when requested by either party shall, direct the jury to find separate special verdicts determining the amount of damages and the percentage of negligence attributable to each party; and the court shall then reduce the amount of such damages in proportion to the amount of negligence attributable to the person recovering. When there are two or more persons who are jointly liable, contributions to awards must be in proportion to the percentage of negligence attributable to each; provided, however, that each shall remain jointly and severally liable for the whole award. Upon the request of any party, this section must be read by the court to the jury and the attorneys representing the parties may comment to the jury regarding this section.

NDCC 9–10–07. This section addresses only negligence and does not authorize or require a diminution in the amount of damages awarded to an injured party by any amount that might be attributable to another person's non-negligent, intentional, and criminal act. So, under NDCC 9–10–07, Molachek's criminal act could not be compared with the negligence of Urie and Kirby to reduce McLean's recovery.

Legislation enacted in 1987 directs comparison of "fault," rather than comparison of "negligence," and it includes within "fault" both "negligence" and "reckless or willful conduct." NDCC 32–03.2–02. That statute, however, "applies only to claims accruing after July 8, 1987." *Butz v. Werner*, 438 N.W.2d 509, 516 (N.D.1989). Because NDCC 32–03.2–02 is inapplicable, Molachek's criminal act may not be compared with the negligence of Urie and Kirby to reduce McLean's recovery.

In *Mauch v. Manufacturers Sales & Serv., Inc.*, 345 N.W.2d 338 (N.D.1984), we held that NDCC 9–10–07 was not applicable in a products liability suit under the doctrine explained in *Restatement (2d) of Torts* § 402A. We did, however, adopt comparative causation as a method of balancing a plaintiff's and a defendant's concurring causes of injury:

> However, in view of the Legislature's acceptance of comparative-negligence principles as demonstrated by its enactment of Section 9–10–07, N.D.C.C., and in following a course which we believe is most fair and just to all parties, we hold that where an unreasonably dangerous defect of a product and the plaintiff's assumption of risk or unforeseeable misuse of the product are concurring proximate causes of the injury suffered, the trier of fact must compare those concurring causes to determine the respective percentages by which each contributed. (Citations omitted.) We further hold that the comparison of causations under a products-liability claim should be on a pure comparative-causation basis, unlike the statutory scheme of modified comparative negligence under Section 9–10–07, N.D.C.C. Thus the plaintiff's misuse of the product will reduce the recovery by the percentage of damage attributable to the misuse but, even though equal to or greater than the causation attributable to the defective condition of the product, will not act as a total bar to the plaintiff's claim.

345 N.W.2d at 348. In *Day v. General Motors Corp.*, 345 N.W.2d 349 (N.D.1984), we reached a similar conclusion that causes should be compared between a manufacturer and a user.

Kirby contends that "[i]n order to determine the amount owed by Kirby to McLean, if any, it was necessary for the jury to assign relative percentages of fault to Molachek, Urie and Kirby." Kirby argues that NDCC 32–03.2–02 "further reflects the legislature's acceptance of fault comparison ... identified ... in ... *Mauch* and *Day*"; and that, under *Mauch* and *Day*, "the fault of Molachek, Urie and Kirby should, in fairness and justice to all the parties, be compared." We disagree.

*Mauch* and *Day* are inapposite. We adopted comparative causation in those cases as a way of adjusting damage liability when a manufacturer and a consumer in a products liability action were both at fault—where an unreasonably dangerous defect in the defendant's product and the plaintiff's assumption of risk or unforeseeable misuse of the defendant's unreasonably dangerous defective product were concurring proximate causes of the injury suffered by the plaintiff. Here, no one has suggested that McLean was in any way responsible for her injury. There is no reason to apply *Mauch* and *Day* to reduce McLean's recovery.

Kirby argues that "the fault of Molachek ... should, in fairness and justice ... be compared" with that of Urie and Kirby. We do not agree. The negligence of Urie and Kirby placed Molachek in McLean's apartment, thereby enabling Molachek to rape McLean. It does not strike us as fair or just that McLean's recovery should be diminished by allowing Kirby to have its liability reduced by any "relative percentage[ ] of fault" that a jury might attribute to Molachek, who did not appear in the action and who was in McLean's apartment on behalf of Urie and Kirby and as a result of their negligence.

Relying on *Horejsi v. Anderson*, 353 N.W.2d 316 (N.D.1984), Kirby contends that Molachek's fault was imputed to Urie and was released when McLean entered into a settlement agreement with Urie. In *Horejsi*, this court held that a plaintiff's release of a servant also released the serv-

ant's masters from any liability based upon respondeat superior. The plaintiff's negligent hiring claim against the masters was pending and not involved in the *Horejsi* decision. *Horejsi* dealt with vicarious liability. This case involves direct, not vicarious, liability.

We are not persuaded by Kirby's argument that we should extend *Horejsi* and rule that the release of Urie released Molachek. Urie's liability to McLean, but for the settlement, would have been based upon respondeat superior, a vicarious liability, and negligent hiring, a direct liability. Kirby's liability under the doctrine described in *Restatement* § 413 is a direct liability. We are not persuaded that the release of a master for direct liability based upon the acts of a servant should affect possible direct liability of the one who employs the master as an independent contractor.

### 4. Insufficient evidence.

Kirby contends that "there was insufficient evidence to support the finding that any act or omission of Kirby was the proximate cause of McLean's injuries." We disagree.

■■■ In reviewing fact questions tried to a jury, we view the evidence in the light most favorable to the verdict, and our review is limited to determining if there is substantial evidence to support the verdict. *Dewey v. Lutz*, 462 N.W.2d 435 (N.D.1990). The jury could find from the evidence that Kirby took no precautions to minimize the risk of harm to people who admitted Kirby dealers into their homes.

We believe that the jury could reasonably have agreed with McLean's assessment of the evidence:

[E]vidence and reasonable inferences therefrom established that, had the Kirby Company provided for special precautions in the recruitment of dealers, Urie would have incorporated those precautions into his recruitment practices.

Special precautions, in the form of reasonable, feasible and minimal background inquiry and investigation, were available and would have identified Molachek as a person with criminal and dangerous propensities.

Viewed in the light most favorable to the verdict, we conclude that there is substantial evidence to support the verdict. We, therefore, conclude that the evidence is sufficient to support the verdict against Kirby.

### II.   McLEAN'S APPEAL

McLean sought punitive damages. At the time of her rape, NDCC 32–03–07 said:

In any action for the breach of an obligation not arising from contract, when the defendant has been guilty of oppression, fraud, or malice, actual or presumed, the court or jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant.

The jury did not award punitive damages.

McLean contends that the trial court made two errors in instructing the jury on her claim for punitive damages: (1) the trial court erred in failing to give an instruction defining reckless disregard; and (2) the trial court erred in instructing that the burden of proof for punitive damages is by clear and convincing evidence, rather than a preponderance of the evidence.

### 1.   Failure to define reckless disregard

■■■ The trial court instructed the jury that it could award punitive damages if it found "that the Defendant acted with oppression or malice as defined in these instructions." The instructions defined malice:

The terms "malice" or "maliciously" import a wish to vex, annoy, or injure another person, or an intent to commit a wrongful act, established either by proof or presumption of law. Malice may consist of (1) a direct intention to injure another or (2) a reckless disregard of another's rights and the consequences that may result. Malice is not limited to a spiteful, malignant, or revengeful disposition and intent; it includes wrongful and improper motives as well as intent to commit a wrongful or improper act. If a wrongful or unlawful act is willfully or deliberately committed, the law presumes that the act was committed with unlawful intent.

Malice may be actual or presumed. "Presumed malice is 'that state of mind which is

reckless of law and of the legal rights of the citizen in a person's conduct toward that citizen.' " *Stoner v. Nash Finch, Inc.,* 446 N.W.2d 747, 754 (N.D.1989), quoting *Shoemaker v. Sonju,* 15 N.D. 518, 108 N.W. 42, 44 (1906). "Presumed malice may be found where the defendant's conduct amounts to a reckless disregard of the rights of others." *Slaubaugh v. Slaubaugh,* 466 N.W.2d 573, 581 (N.D.1991). However, as we said in *Stoner,* 446 N.W.2d at 756: "We believe that the statutory terms 'oppression, fraud, or malice' . . . are sufficiently clear to persons of ordinary intelligence to afford a practical guide for behavior, and are capable of application in an even-handed manner."

We do not believe that the term "reckless" is any less clear to persons of ordinary intelligence. Thus, while the trial court could have defined "reckless" or "reckless disregard" if it had deemed it necessary, we conclude that the trial court did not err in failing to define "reckless disregard."

## 2. Burden of proof

McLean contends that the trial court erred in instructing that the burden of proof for punitive damages is by clear and convincing evidence, rather than by a preponderance of the evidence.

Since it was enacted, what is now codified as NDCC 32–03–07, has not specified a particular burden of proof.[1] This court has never decided the appropriate burden of proof applicable to NDCC 32–03–07.[2]

McLean cites a number of decisions from other jurisdictions for the proposition that the appropriate burden of proof for punitive damages is a preponderance of the evidence. Kirby cites a number of decisions from other jurisdictions for the proposition that the appropriate burden of proof for punitive damages is clear and convincing evidence. In our view of the evidence presented in this case, we need not determine which burden of proof is appropriate.[3]

▮▮▮ Mere negligence does not authorize an award of exemplary damages.

1. At an early date, the California Supreme Court held that a preponderance of evidence is all that is necessary to warrant a finding of exemplary damages. *St. Ores v. McGlashen,* 74 Cal. 148, 15 P. 452 (1887). At that time, California's exemplary damage statute, Cal.Civ.Code § 3294, first enacted in 1872, was virtually identical to NDCC 32–03–07, both having been derived from a proposed civil code drafted for, but never adopted by, New York.

The historical annotation to NDCC 32–03–07 incorrectly lists its first source as the 1877 Civil Code for the Territory of Dakota, § 1946, and indicates that it was derived from California Civil Code § 3294. What is now codified as NDCC 32–03–07 was first enacted as § 1839 of the 1865 Civil Code for the Territory of Dakota, approved on January 12, 1866. The Civil Code had been drafted primarily by David Dudley Field for a New York Code Commission. W. Fisch, *Civil Code: Notes For An Uncelebrated Centennial,* 43 N.D.L.Rev. 485 (1967). California adopted an amended version in 1872, effective January 1, 1873. *Id.* The Civil Code was "revised, enlarged and re-enacted by Dakota" as the 1877 Civil Code for Dakota Territory. Preface, the Revised Codes of the Territory of Dakota (1877). "New York . . . ultimately abandoned the project." Fisch at 486. Because many California Civil Code sections and many sections of the North Dakota Century Code share a common derivation from Field's Civil Code, "California court decisions construing Field Code

sections, while not binding, are entitled to respectful consideration, and may be 'persuasive and should not be ignored.' " *Glatt v. Bank of Kirkwood Plaza,* 383 N.W.2d 473, 477 n. 4 (N.D. 1986), quoting *Becker v. Becker,* 262 N.W.2d 478, 483 (N.D.1978).

This court has often noted other inaccuracies in the historical annotations to other sections of the North Dakota Century Code. *See Estate of Stuckle,* 427 N.W.2d 96, 99 n. 6 (N.D.1988) (Meschke, J., concurring); *J.P. Furlong Enterprises, Inc. v. Sun Exploration & Production Co.,* 423 N.W.2d 130, 135 n. 15 (N.D.1988), *Glatt v. Bank of Kirkwood Plaza; Becker v. Becker.*

2. In *Stoner v. Nash Finch, Inc.,* 446 N.W.2d 747, 756 n. 7 (N.D.1989), we quoted the trial court's instruction that said "the plaintiff must prove the oppression or malice by clear and convincing evidence before [the jury] may award exemplary damages." However, the appropriateness of that instruction on the burden of proof was not questioned in *Stoner.*

3. We are aware of changing legislative treatment of exemplary damages. NDCC 32–03–07 was amended in 1987 to require an amended pleading to seek exemplary damages. S.L.1987, Ch. 400, § 1. NDCC 32–03–07 was suspended from July 8, 1987, through June 30, 1993. S.L. 1987, Ch. 404, § 15. During that suspension, NDCC 32–03.2–11 (S.L.1987, Ch. 404, § 11) is in effect. NDCC 32–03.2–11 authorizes exemplary

*Ebaugh v. Rabkin,* 22 Cal.App.3d 891, 99 Cal.Rptr. 706 (1972); *Prosser and Keeton on Torts* § 2 (5th ed. 1984). *Compare Lang v. Wonnenberg,* 455 N.W.2d 832 (N.D.1990). The evidence presented at this trial established nothing more than negligence. As a matter of law, there was insufficient evidence for a jury to find conduct by Kirby that would justify a punitive damage award.

The judgment is affirmed.

ERICKSTAD, C.J., MESCHKE, J., and MAURICE HUNKE, District Judge, concur.

MAURICE HUNKE, District Judge, sitting as a member of the Court to fill the vacancy created by the resignation of Justice H.F. GIERKE III. Justice JOHNSON, not being a member of this Court at the time this case was heard, did not participate in this decision.

LEVINE, Justice, specially concurring.

I agree with most of the majority opinion but write specially to address an error by the trial court which is particularly troublesome.

The trial court should have decided the issue of Kirby's duty under *Restatement (2d) of Torts* § 413 as a matter of law. *Madler v. McKenzie County,* 467 N.W.2d 709 (N.D.1991). I agree with the majority that, at some point, the trial court concluded that there was a duty. But the trial court failed to inform the jury that it had ruled that Kirby had a duty to use reasonable care in seeing that the distributor used reasonable care in screening prospective in-home salespersons in order to minimize a foreseeable risk of harm to customers. Instead, the trial court instructed the jury on "peculiar unreasonable risk," while asking the jury to decide only whether Kirby was "negligent" and whether its negligence proximately caused plaintiff's damages.

The jury found Kirby negligent and awarded damages to plaintiff.

Does this omission require a new trial? I agree it does not. I also agree that in-home demonstrations for purposes of sales present a peculiar unreasonable risk under *Restatement (2d) of Torts* § 413. Unless we were to assume a painfully cynical view that all men were potential rapists, we must conclude that rape by an in-the-home salesman is not an ordinary risk that inheres in the nature of the work and that would arise in the course of the ordinary and usual method of conducting in-home sales, but, instead, is a peculiar and unreasonable risk of physical harm. *Compare Peone v. Regulus Stud Mills, Inc.,* 113 Idaho 374, 744 P.2d 102 (1987) [sawmill operator was not responsible for injury to independent contractor's employee because risk of falling tree was ordinary danger that arises in the course of work of the independent contractor logging company and not a peculiar risk]; *Ortiz v. Ra–El Development Corp.,* 528 A.2d 1355 (Pa.Super.1987), *appeal denied,* 517 Pa. 608, 536 A.2d 1332 (1987) [no peculiar risk to employee of masonry subcontractor injured during fall from scaffold because peculiar risk is not an ordinary risk associated with work being done but involves circumstances substantially beyond ordinary ones].

We are particularly vulnerable in our homes, removed from the public eye. Kirby's national reputation allows its representatives easier entry into our homes than might otherwise be the case. I agree with the majority that allowing an unscreened person into a home to demonstrate a product can produce a peculiar unreasonable risk of robbery, rape or murder, which imposes upon Kirby a section 413 duty of care to the plaintiff.

Because there was a duty under the peculiar risk exception, the jury's finding that

damages "when the defendant has been guilty by clear and convincing evidence of oppression, fraud, or malice." The enactment of NDCC 32–03.2–11 and the suspension of NDCC 32–03–07 in S.L.1987, Ch. 404, were contained in House Bill 1571, a "tort reform" bill designed to address the cost of lawsuits, insurance premiums, and the availability of insurance. David Peter-son, an attorney representing himself and the Board of Governors of the State Bar Association of North Dakota, testified before the House Judiciary Committee that the section of the bill dealing with exemplary damages "is particularly obnoxious because it raises the standard of proof from that of a greater weight of the evidence to clear and convincing evidence."

Kirby was "negligent" is not reversible error, as Kirby argues. The elements of negligence are duty, breach, proximate cause and damages. In order to have found Kirby negligent, the jury must have found that Kirby breached its duty of care. Even if, as Kirby argues, the jury may only have found "ordinary negligence" and not negligence under section 413, that finding would be sufficient. I say that because the only duty at issue here was Kirby's duty to use reasonable care to supervise or instruct its distributors to use reasonable care in screening salespersons. That duty is the same under "ordinary negligence" as it is under section 413. The jury's finding of a duty, in effect, was surplusage, because the trial court did, in fact, determine there was a peculiar-risk-duty. The key element in the jury's finding of negligence is that there was a breach of Kirby's duty of care in supervising distributors.

Kirby argues persuasively that the trial court should have decided the issue of Kirby's duty. Our response is that it did. However, the failure to inform the jury that it had so decided is surely not a paradigm of good trial practice. But, I agree that the verdict is sustainable.

VANDE WALLE, J., concurs.